## Burton v. Commonwealth.
## Harvey v. Commonwealth.

(Decided January 17, 1913.)

### Appeal from Floyd Circuit Court.

1. Homicide—Indictment for—Evidence.—Evidence examined and held sufficient to sustain the verdict of conviction in Burton's appeal, and not to sustain the conviction in Harvey's appeal.

2. Homicide—Joint Indictment for—Conspiracy—Evidence.—Where several defendants are jointly indicted for murder, and for a conspiracy to murder, what took place in the presence of all of them was competent evidence against all of them.

3. Argument of Counsel—Conduct of Commonwealth's Attorney in Argument—No Objection Taken—When Cannot Be Reviewed

Upon Appeal.—Where no. objection was taken to the argument of the Commonwealth's Attorney to the jury, his conduct in that respect cannot be reviewed upon appeal.

4.    Argument    of    Counsel—Latitude in—Limitation    Upon.—Much latitude is of necessity allowed an attorney in the presentation of his case; the only limitation being such as require him to confine himself to the facts introduced in evidence, and the fair and reasonable deductions and conclusions to be drawn therefrom, and the application of the law, as given by the court, to the facts proven.

5.    Argument of Counsel—Improper Conduct of Commonwealth's Attorney in Argument—Admonition of Court.—The statement of the Commonwealth's Attorney in his argument that the defendant had killed one man, which fact, he urged, tended to show defendant was guilty of the crime for which he was being tried, was improper conduct upon the part of the Commonwealth's Attorney; but as the court admonished the jury not to consider the statement of the Commonwealth's Attorney, and the fact of the former killing, except in so far as it tended to affect the credibility of the defendant as a witness, and for no other purpose, the defendant was not prejudiced, although the admonition was not given until after the close of the argument of the Commonwealth's Attorney.

6.    Argument of Counsel—Improper Argument of Commonwealth's Attorney—When not Ground for Reversal.—Although the court erred in failing to admonish the jury not to consider an improper statement of the Commonwealth's Attorney, the error is not ground for a reversal, where it clearly appears that the ruling was unimportant, and did not affect the verdict.

A. J. MAY and BYRD, NICKEL & HOWARD, for appellants.

W. H. MAY, JAMES GARNETT, Attorney-General, and M. M. LOGAN, Asst. Attorney-General, for Commonwealth.

OPINION OF THE COURT BY JUDGE MILLER—Affirming as to Berry Burton, and reversing as to Charley Harvey.

On February 6, 1912, the grand jury of Magoffin county returned an indictment against Berry Burton, Charley Harvey, Ben. Harvey, Robert Harvey and Willie Harvey, charging them with the murder . of Samuel Pickleseimer. The first count charges that all the defendants did the shooting and killing; while the second count charges that all of the defendants conspired together to kill Pickleseimer, while Burton did the shooting and killing, the other defendants being then and there present, and aiding and abetting therein. Upon the motion of the defendants a change of venue was granted to Floyd county, where the defendants were tried at the July term, 1912. Upon the conclusion of the testimony for the Commonwealth, and upon their motion, the court

peremptorily instructed the jury to find the defendants, Willie Harvey and Robert Harvey, not guilty, which was done; but it overruled a similar motion made by the other defendants. At the conclusion of all the testimony, the remaining defendants repeated their motion for a peremptory instruction, which was overruled. The jury acquitted Ben Harvey, but found the defendants Berry Burton and Charley Harvey guilty of murder, and fixed their punishment at confinement in the penitentiary for life. They appeal.

Many grounds were relied upon below for a new trial, but the brief for appellants confines the argument for a reversal to three points: (1) that the verdict is against the law and the evidence; (2) that the court erred in admitting incompetent testimony; and, (3) the improper conduct of the Commonwealth's Attorney in the argument of the case. All other grounds for a new trial having been abandoned in the brief for appellants, we will confine this opinion to the points above suggested.

1. The ground that the verdict is against the law, and is not sustained by the evidence, requires a careful examination of the testimony. The record is a voluminous one, and shows the following material facts: Samuel Pickleseimer was 53 years old, and lived on Cow Creek, in Magoffin county, about two miles from Berry Burton's residence, and 400 or 500 yards from John Harvey's residence. Henry Harvey's place adjoined that of his brother John. Charley Harvey and Willie Harvey are sons of John Harvey, while Ben Harvey and Robert Harvey are sons of Henry Harvey. Robert Harvey and Willie were mere boys. Ben Harvey was the son-in-law of his uncle John Harvey. On the night before Christmas, 1911, Berry Burton had gone to John Harvey's to spend the night, and while there, at about dark, he met Ben Harvey and Charley Harvey. Ben Harvey and his wife had gone to John Harvey's to spend the night and Christmas with their parents. Several days before, Wiley Reed had promised Ben Harvey a half bushel of apples for Christmas, and about dark Ben suggested that they go down to Reed's that night and get them. He asked Burton and Charley Harvey if they would go with him, and they consented. They started down the creek to Reed's, Berry Burton having a pint of whiskey and a revolver. Ben stopped at the residence of his father Henry Harvey, and procured a lantern which they lighted as the night was dark. About this time the two

boys, Willie and Robert Harvey, joined them, and the
five proceeded on their way, which led them through
or by Pickleseimer's place. Willie Harvey had taken
his father's shotgun, evidently for the purpose of having
some "Christmas guns." In order to avoid the muddy
roads they went through the fields part of the way;
and as they reached Pickleseimer's place, Bertie Pick-
leseimer, a daughter of Samuel Pickleseimer was in the
garden through which they passed, and testified, that
the appellants, having trouble getting through a barbed
wire fence, Berry Burton remarked that any man who
would build a fence like that ought to have his brains
knocked out. Burton denies this; and, although several
persons were present at the time, Bertie Pickleseimer
is the only one who testified to the declaration. When
the party reached Pickleseimer's house, Burton decided
that he wanted to talk to his brother, who lived on Half
Mountain; and, as Pickleseimer had a telephone in his
house, Burton entered the house to see if he could talk
to his brother over the telephone. Some of the other
boys, including Charley Harvey, went with him into
the house. Ben Harvey, who was carrying his lantern,
stopped in the garden where Bertie Pickleseimer and
Roscoe Gullett and his wife were getting some apples
from the ground, where they had been stored. Willie
Harvey left his shotgun on the outside of the house,
and went in; and by this time they were all in the
house. Nothing happened while they were there, out
of the ordinary. When it was found, however, that
Burton's brother lived half a mile or more from the
telephone station, Pickleseimer suggested to Burton that
it was more than likely he would not be able to get his
brother that night, and inquired what he thought about
postponing it until next morning; whereupon Burton
said that would do just as well, and they made no further
attempt to get his brother. Pickleseimer then called
the attention of the crowd to the fact that some one was
playing the graphophone over on Grape Creek, and it
could be heard over the telephone; and, as a matter of
curiosity, and at Pickleseimer's invitation, all of those
present took turns in listening to the graphophone. Some
one of the visitors then suggested that it was time for
the defendants to leave, when Pickleseimer invited them
to stay all night. They told him, however, that they
could not stay, and they all left in an apparently good
humor, Ben Harvey carrying the lantern. As they went

down the creek they called at Patrick Rizner's, but Rizner had retired for the night. He got up, however, and came to the door; whereupon Burton told him he had come for those apples, which Rizner had promised him a few days before, but Rizner told him there had been a lot of people there during the day, and that no apples were left. Rizner invited the defendants to come in, and Burton suggested that they go in and have Rizner's girls play for them on the organ; but Rizner said that the girls were not there, that they had all gone down to his son's, Chester Rizner, whereupon the defendants departed. Continuing down the creek in the direction of Wiley Reed's, they next stopped at Minix's store and got two bottles of "hot drops," and drank them. They then went to Wiley Reed's where Burton and Ben Harvey went in to see about the apples which Reed had promised Burton, but Reed told them he had sold nearly all of his apples, and had only about a half bushel left; and of these he gave Burton and Ben Harvey about a dozen apples apiece. The defendants then all started back up the creek toward home, and when they got to Chester Rizner's, they heard some one picking a banjo. They went in and joined in the festivities. Here they found Bernie Pickleseimer, a son of Samuel Pickleseimer, and Corbett Reed, a young nephew of Samuel Pickleseimer. In the October preceding there had been some difficulty between Bernie Pickleseimer and Burton and Charley Harvey about a fence on Samuel Pickleseimer's farm. Bernie Pickleseimer testified that Burton and Charley Harvey had thrown down the fence, and cursed his father who had remonstrated with them for doing it, and that as they left the place Bernie Pickleseimer fired a shot at them. Burton and Charley Harvey denied this charge, and explained the incident by saying that while they were going along the road, and to get out of the mud, Charley Harvey caught hold of a plank of the fence, which gave way, and that constituted what Bernie Pickleseimer called a tearing down of the fence. Burton and Harvey further said that if Bernie Pickleseimer fired at them, they did not know it, and that they had no words with his father on that subject. At any rate, when the defendants arrived at Chester Rizner's and found Bernie Pickleseimer and Corbett Reed there, their entrance seemed to cast a damper upon the conduct of Bernie Pickleseimer and Reed, who were evidently more or

less nervous by the appearance of the defendants, who were drinking, and more or less boisterous. Some of those who were at Chester Rizner's say that Burton used profane and ugly language, and insisted upon the girls dancing, but that Mrs. Rizner prohibited it. Burton evidently occupied the chief place in what took place at Chester Rizner's, by walking around the room, rolling apples across the floor to the girls, and monopolizing the conversation. His pistol could be seen, and several of the defendants, according to Pickleseimer, would go out of the room every now and then and have a conversation with each other. At one time Burton leaned over and asked Ben Harvey "if he was right," and Ben said, "I am always right;" whereupon Burton said, "if you ain't right I will get you right." The others did not understand what they meant.

Finally, Burton pointed his finger at Bernie and said, "Why would I want to kill that man for, and he sitting there smoking and doing himself some good?" These disconnected statements disconcerted Bernie Pickleseimer and Reed, and shortly thereafter they departed, riding horseback. Burton admits that he made the remark substantially as above given, but explained it by saying that he had been badgering one of the girls about women fighting with broom sticks and churn dashers, and that finally he remarked to her that if he had a sand stone he would hit her with it; whereupon she said, "Why don't you hit Mr. Pickleseimer over there?" and, in reply to her question, he made the answer above given.

Ada Rizner testified that after Pickleseimer and Reed had gone, Burton said to Chester Rizner, "I know how to get rid of a G——D—— crowd like that; pick us another tune and we will have to go." In this Ada Rizner is corroborated by her sister Hester, who further says that Burton and his friends seemed not to be in a good humor, and that there was no enjoyment going on. She says the defendants were drinking and cursing, and seemed to be excited; that they whispered around among themselves, and went out on the porch once or twice and talked together. The defendants remained at Chester Rizner's two hours or more, and finally left there about fifteen minutes after the departure of Bernie Pickleseimer and Corbett Reed.

Chester Rizner's house is only 366 yards from Samuel Pickleseimer's house. As the defendants left Rizner's,

they lighted their lantern, which went out; whereupon two of the boys returned to the house and procured some matches from Chester Rizner and relighted their lantern and proceeded up the road, all going together, and Ben Harvey carrying the lantern. In the meantime, Bernie Pickleseimer and Corbett Reed had reached the residence of Samuel Pickleseimer, where Reed was to spend the night with Bernie; and, after procuring a lantern, they led their horses to the barn, which was about 150 yards back of the house, where they put them in the stable and fed them. As they left the barn they saw the defendants coming up the road, firing the shotgun and the pistol. Defendants claim they were merely firing "Christmas guns" and cannon crackers. Immediately below the Pickleseimer residence the road crosses a small branch; while Pickleseimer's corn crib stands inside his fence between the branch and the residence, and fifty-six feet from the residence. At the side of the crib there is a post, which is about twenty feet from the road. As Bernie Pickleseimer left the barn he fired his pistol once or twice into the ground to let the defendants know, as he says, that he was there, and to keep them from firing into the house. He and Reed then went on to the house, and as they passed around near the front porch, the defendants had crossed the branch and were proceeding up the road toward the corn crib. Bertie Pickleseimer, the daughter, had gone out upon the porch with her mother, and when asked to tell all that occurred, she testified as follows:

"A. Just as they were crossing the branch they shot, and just as they were fixing to cross the branch they shot their pistols off again, and guns, and then they crossed the branch. Charley Harvey hollowed and says 'Berry, let's let these off again. They sounded good to me.' And then he said something else low and I couldn't understand what it was. Berry says, 'Yes, by God, I have killed one God damned son-of-a-bitch and I will kill another,' and Ben Harvey says, 'Yes, if we have to run them under the bed.'"

"Q. Where were they when they said that?

"A. They had crossed the branch at the time."

It was now between 10 and 11 o'clock. In the meantime, Samuel Pickleseimer had gone out on the porch to learn the cause of the shooting. He told his son Bernie to go into the house. As Bernie Pickleseimer passed from the well to the front porch, he again fired

his pistol into the ground near a tree to warn the defendants that he was there, whereupon, according to his testimony, and almost immediately, four shots were fired from the crib post, about fifty feet distant. One shot passed through Bernie's coat; another landed in a post above the second floor of the porch; another in a joist of the second floor; while another bullet struck and killed Samuel Pickleseimer, who was standing upon the porch. A light was shining from the house out upon the yard toward the corn crib; and, according to the testimony of Bernie Pickleseimer and that of his sister Bertie, they recognized Burton from the flash of his pistol as the one who fired the four shots while he was standing at the crib post. They further testify that immediately before the shooting they had seen Ben Harvey blow out the light in the lantern. On the other hand, the defendants say that while they were coming up the road and just before they reached the branch, they heard the shots fired from near the barn, and as Ben Harvey jumped across the creek, the lantern struck the bank and the light went out; that just at this time, and while they were down near the creek, several shots were fired from the porch of the residence—the bullets whistling near them. According to their own testimony, Burton and Charley Harvey were several steps in the lead, and when these shots were fired from the porch, Ben Harvey and the two boys immediately retreated in the other direction through the field, so as to avoid going by the house, but that Burton and Charley Harvey stood their ground. Charley Harvey called for the shotgun that Willie Harvey was carrying, but as the latter was retreating in the other direction, Charley Harvey never got the shotgun. Burton, however, admitted that he immediately returned two shots, directed at the porch, for the purpose of defending himself against what he called an attack by some one standing on the porch of the Pickleseimer residence. Burton denies emphatically that he was near the corn crib, or that he got over the fence into the Pickleseimer property. Several witnesses, however, testify that they found several gun shells and pistol shells immediately behind the corn crib, of the size and character which Burton admits he used in his pistol.

Furthermore, it appears that a shot fired from the position which Burton claims he occupied could not have struck Samuel Pickleseimer. Immediately after the shooting, Burton and Charley Harvey retreated across

the field and joined the other three defendants near the Pickleseimer barn. Defendants claim they did not know that Pickleseimer had been killed until the next day, when the neighbors began to gather and spread the news. They submitted to arrest on the next day, but after they had been in jail for some time, Burton and Charley Harvey broke jail by forcibly taking the jailer's pistol from him. They were pursued by the citizens, and were shortly surrounded and captured.

Under this evidence, did the trial court err in overruling the appellants' motion for a peremptory instruction, or in refusing a new trial upon the ground that the verdict is not sustained by the evidence? As to Berry Burton there can be no doubt that the court ruled correctly. He admits he shot twice in the direction of the house, and the disputed question as to where he was standing when he did the shooting was one peculiarly for the jury. The question of his guilt was properly left with the jury, and the verdict is amply sustained by the evidence.

As to Charley Harvey, however, the case is different. It is nowhere shown that he had a gun or a pistol, or that he fired a shot at any time, or that he had any motive to do so. It is true he was near Burton at the time Burton fired the shots at the Pickleseimer house, but there is nothing to show that he did anything more than would be indicated by his presence, and that he retreated in the other direction immediately after the shots were fired. He admits that for the purpose of protecting himself from what he supposed was an attack, he called upon Willie Harvey for his gun, but it is nowhere shown that he ever got possession of the gun, or that he ever fired a shot.

After a careful examination of all the evidence, we are of opinion that it does not sustain the verdict against Charley Harvey, and that it should be reversed and set aside as to him, for that reason.

2. It is insisted that the court improperly admitted the testimony as to what happened at Chester Rizner's. This point is, however, not well taken, since the defendants were charged with a conspiracy, and there was some evidence tending to sustain that charge. It is insisted, however, that what Burton there said, related to Bernie Pickleseimer and not to the decedent, Samuel Pickleseimer. The criticism of the ruling might have more force if it had been made to appear that Burton

was shooting at Samuel Pickleseimer; but so far as this evidence shows, he may have been firing at Bernie Pickleseimer, and in doing so killed his father.

3. The action of the Commonwealth's Attorney in his argument to the jury is relied upon for a reversal. Five specific errors are pointed out to sustain this ground; but since no objection was taken to the statements of the first, second and fourth grounds, they cannot be reviewed.

The scope which the argument of the Commonwealth's Attorney might properly take was outlined in Housman v. Commonwealth, 128 Ky., 825, as follows:

"Much latitude is of necessity allowed an attorney in the presentation of his case; the only limitations being such as require him to confine himself to the facts introduced in evidence, and the fair and reasonable deductions and conclusions to be drawn therefrom, and the application of the law, as given by the court, to the facts proven. Controlled, regulated, and bounded alone by these limitations an advocate may, with perfect propriety, appeal to the jury with all of the power, force, and persuasiveness which his learning, skill, and experience enable him to command, and of this character of argument the accused may not complain, even though he feels that his conviction may be traceable more directly to the argument of counsel than to the facts proven."

The third item of misconduct is this: The Commonwealth's Attorney stated that the defendant Burton had killed one man, and that the Commonwealth's Attorney had used that fact as tending to show that he was guilty of killing Pickleseimer. To this statement of the Commonwealth's Attorney Burton excepted, and the court was asked to admonish the jury not to consider said statement. The record not only shows that Burton admitted in his testimony that he had killed another man, but it further shows that the court sustained his motion to admonish the jury not to consider the statements of the Commonwealth's Attorney, and the fact of the former killing, except in so far as it tended to affect the credibility of Burton as a witness, and for no other purpose. In this the court was clearly right. It is contended, however, that this admonition came too late, because it was not given until after the close of the argument of the Commonwealth's Attorney. That, however, was in ample time.

Finally, the Commonwealth's Attorney said the attorney for the defendant had taken the two defendants, Robert Harvey and Willie Harvey, after they had been discharged upon peremptory instructions, into the jury room and talked to them about an hour, and then refused to introduce them as witnesses, "because they could not tell their story right." The attorneys for the defendant excepted to this statement, and moved the court to admonish the jury not to consider this statement, but the court overruled the motion. This ruling was improper, but the statement was unimportant, and clearly did not affect the verdict.

After a careful consideration of the whole case, we are satisfied that Berry Burton has had a fair trial, and that there is no substantial error in the record as to him.

Judgment affirmed as to Berry Burton, and reversed as to Charley Harvey, with instructions to grant him a new trial.