## Welch v. Commonwealth.

(Decided November 19, 1920.)

Appeal from Fayette Circuit Court.

1. Criminal Law—Arguments and Conduct of Counsel.—The Commonwealth's attorney in his closing argument to the jury should confine himself to the testimony heard upon the trial and to reasonable and legitimate deductions to be drawn therefrom, and not to assert as a proven fact that which there is no testimony or circumstances from which it might be legitimately deduced. Within such limits it is proper for the attorney to explain or reconcile contradictions in the testimony, but he should not refer to or comment on excluded testimony. But it is not in every case improper to refer to such excluded testimony, since he may do so for the purpose of answering a reference made to it by attorney for defendant provided his reference is strictly confined to making such answer.

2. Criminal Law—Conspiracy—Evidence.—A conspiracy being difficult of proof is necessarily established by the testimony of a number of circumstances constituting links in the formation of the general purpose of the conspirators, all of which when considered together are sufficient to establish the conspiracy.

3. Criminal Law—Conspiracy—Evidence.—It is not necessarily incompetent to admit the introduction of evidence the relevancy of which depends upon the proof of other facts not at the time in evidence, but which the party offering it proposes to subsequently introduce, and this is especially true in conspiracy cases, where the court may admit testimony of the conduct and declarations of an alleged co-conspirator upon the avowal that the defendant will be connected therewith later on in the trial. But if such connection should not be made it is the duty of the court to withdraw the conditionally admitted testimony in language equally as comprehensive as the testimony itself.

4. Criminal Law—Conspiracy—Evidence.—The better practice would be to withdraw such testimony at the close of the case of the party offering it, but it is within the sound discretion of the court to not withdraw it until the close of all the testimony, and such discretion will not be interfered with on appeal unless plainly and manifestly abused.

5. Criminal Law—Conspiracy—Evidence.—In this case the court admitted testimony of incriminating acts of defendant's alleged co-conspirator at a time when the conspiracy was not established by any testimony then introduced. The motion to exclude it made at the close of the Commonwealth's testimony was overruled, but it was sustained at the close of the defendant's testimony. Held that under the facts and circumstances proven in the case the error, if any, was not sufficiently prejudicial to defendant's rights as to authorize a reversal of a judgment of conviction.

W. C. G. HOBBS, MORRIS & JONES and MAURY KEMPER for appellant.

CHARLES I. DAWSON, Attorney General, and THOMAS B. McGREGOR, Assistant Attorney General, for appellee.

OPINION OF THE COURT BY JUDGE THOMAS—Affirming.

The appellant, James Welch, was indicted for and convicted of the crime of murder in the Fayette circuit court and his punishment fixed at confinement in the penitentiary for and during his natural life, and the court having overruled his motion for a new trial, he prosecutes this appeal. The victim of the homicide was J. S. Thomason, the instrument used by appellant was an automatic Savage pistol and the offense was committed on Main street in the city of Lexington at about four o'clock in the afternoon of December 24, 1919. The appellant and Mrs. J. S. Thomason, wife of deceased, were jointly indicted and in the first count they were jointly accused of committing the crime. In the second count they were accused of forming and entering into a conspiracy for the purpose of murdering the deceased and in pursuance thereto and while the conspiracy existed the appellant committed the crime. A number of grounds are included in the motion for a new trial as reasons for setting aside the verdict, but counsel in their brief urge before us but three, they being: (1) Misconduct of the Commonwealth's attorney in his concluding argument to the jury; (2) improper remarks by the court during the progress of the trial and while the evidence was being introduced, and (3) error of the court in the admission of testimony introduced by the Commonwealth and in refusing to with-

draw it with sufficient *promptness* after motion made for that purpose.

Before considering either of the three grounds relied on in brief of counsel, we deem it proper to make a condensed statement of the more important facts disclosed by the testimony. Appellant and defendant, Welch, is a farmer residing in Fayette county. He is about thrity-seven years of age and was and had been a widower for about two years at the time of the homicide. About eighteen months before then he formed the acquaintance of Mrs. Thomason, whose husband was what is ordinarily known as a drummer and who plied his vocation in the surrounding territory of Lexington, using principally a Ford automobile. They had two infant children and a colored girl about fifteen years of age lived with them and assisted Mrs. Thomason in nursing and looking after them and in attending to the household duties. Defendant first met Mrs. Thomason at the home of her sister in Lexington where he was paying respects to a young lady friend. Not long after this meeting he began visiting the home of the Thomasons, mostly at night and when Mr. Thomason would be away engaged in his work. At first the visits were not so frequent but they gradulaly became more so until they would occur some two or three times or more per week and he would remain at the Thomason home on these visits sometimes late in the night and at one time practically all night. While the testimony of the colored servant is greatly contradictory, it sufficiently appears therefrom and from irresistible conclusions, that Welch and Mrs. Thomason spent part of the time in another room and away from the colored girl and the children, who would most generally retire between seven and eight o'clock. At one time, according to the testimony of the colored girl, defendant and Mrs. Thomason sat upon the side of the bed and defendant kissed her, and at another one defendant was at the Thomason home at night when Mr. Thomason returned and found the front door locked with the night latch. He sat his grip on the front porch and went to the rear of the house to gain entrance. He and Welch spoke to each other and the latter immediately departed. Welch explains this and some of the other visits by saying he had pastured a pony for Mrs. Thomason and eventually sold it for her and he called to collect the pasturage fees and to settle with her for the price he received for the pony. It furthermore

appears, and which fact is admitted by defendant, that on making these visits he would carry his pistol and on arrival would take it out of his pocket and place it on the mantle or some other place, which he explained was for the purpose of preventing the children from getting possession of it and perhaps injuring themselves. Nearly eleven months before the homicide Mrs. Thomason wrote defendant a letter, which with others and her photograph was found by the officer in his pocket on the day of the killing. The letter was dated at Lexington on February 4, 1919, and says: "My dear sweetheart: Just to finish talking to my sweetheart over the 'phone. And I was so glad to hear from you once more. Well, this sure is one gloomy day and I certainly do feel more than sad and lonesome, with one that I love so far away, but if God is on our side I do hope that the time will soon come, when we can be together and there will be no parting, until God calls one of us home. I do hope when this reaches you it finds you true to your promise, and remember I will be true and faithful to you dear heart. Well, I will close for this time. Burn this, safety first. As ever your own." The other communications of Mrs. Thomason found in defendant's possession are of the same affectionate tenor as the one copied, and he admits not only that he received them but that they are in her handwriting. We leave it for the reader to say whether there was an intimacy between the two defendants in the indictment.

On the morning before the homicide that afternoon, the colored servant testified that she answered the telephone in the Thomason residence. The caller was Mr. Welch, who wanted to speak to Mrs. Thomason, and that the latter went to the telephone and conversed with him. Mrs. Thomason, the colored girl and her two infant children left their home at about two o'clock in the afternoon on the fatal day to go down into the city upon some errands, the principal one of which was to do some Christmas shopping. Their automobile was parked on the south side of Main street, practically opposite the court house and just in front of a ten cent store in which Mrs. Thomason went to buy some Christmas presents, including some for the children of Mr. Welch. She had returned from that store and had gotten in her machine, which she herself was driving, and started the engine to running when she looked about a door east of the ten cent store and saw Mr. Welch standing against the wall and motioned for him to come to her. According to the tes-

timony of the colored girl. (Mrs. Thomason not testifying in the case), defendant first shook his head and declined to come, but upon a second request from Mrs. Thomason he did so. He stopped at the front of the machine, the door of which was open, and the parties conversed some ten or fifteen minutes about what each was doing in town and about the sale of Mrs. Thomason's machine, when she replied: "There comes Mr. Thomason." Defendant then turned his head and saw the deceased about the time or just after he had stepped off the walk approaching towards the machine, which was some six or seven feet from the curb, and when he got to about where the defendant was standing he remarked: "What in the hell are you doing here talking to my wife?" Defendant says that at that time he backed to a point in the street about opposite the rear wheel of the automobile and that deceased started towards him with a drawn knife and when he got within three or four feet of him he shot deceased some three or four times, which momentarily appeared to check his advance, but that in a second or so the deceased again advanced towards him and defendant shot him three or four times more, when he fell, striking his head on the running board of the automobile about where it joins and connects with the fender over the front wheel. One other witness, a Mr. Meyers (whose demeanor does not impress us) corroborates the defendant as to the deceased having an open knife in his hands when he first approached the automobile where defendant was standing. Other witnesses who testified for the Commonwealth and who saw the beginning of the difficulty state that the hands of the deceased as he stepped off the sidewalk and approached the machine were hanging down and that he had nothing in them; while still other say that they did not see any of it until after the firing of the first shot, when their attention was directed to it and when they looked they saw no knife or other weapon in the hands of the deceased, although some of them could not see his hands because of the dense crowd of people around, but those witnesses testified that he did not have his hands drawn in any striking or threatening manner. A number of witnesses testified that after the firing of the first few shots the deceased threw up his hands and remarked: "You have got me now," and they say they saw no weapon of any character at that time. A policeman who arrived just after the deceased fell found a closed knife on the running board of the automobile where it connects with the fender

for the front wheel and just opposite the door of the front seat. After the shooting was over another policeman took charge of defendant and while standing there Mrs. Thomason got out of the machine and went to the policeman having the defendant in charge and threw her arms around his neck and inquired: "What must I do now?" She was afterwards taken home and the defendant was taken to the police station where he was searched and the letters and photograph, heretofore referred to, were found upon his person. He explains having his pistol on that occasion solely upon the ground that it had been his custom and habit to go armed.

It will thus be seen that if this case should be determined from the facts immediately connected with the killing the testimony is sufficient to authorize the verdict returned and it is not otherwise contended.

Turning now to the grounds urged in this court for a reversal it will first be necessary to refer to some testimony which the court permitted the Commonwealth to introduce over the objections of defendant bearing upon the conspiracy charged in the indictment. It was made to appear that some time before the killing, but just how long we are unable to gather (although it was after the writing of the above letter by Mrs. Thomason), the deceased on one of his trips, which included Richmond, Kentucky, was poisoned and was carried to a hospital in that city for treatment; that this was brought about by drinking some whiskey with poison in it, and the Commonwealth proved by the colored servant that Mrs. Thomason talked to the witness about the poisoned whiskey being in Mr. Thomason's machine and that she knew it was there and the Commonwealth offered to prove by the same witness that Mrs. Thomason stated that defendant was connected with the poisoning of the whiskey and placing it so that it could be found by the deceased, and perhaps consumed by him, since he was somewhat addicted to its use. The court, however, would not permit the witness to tell anything that Mrs. Thomason said about the defendant's connection with the poisoned whiskey. The Commonwealth was also permitted to prove by the hospital physician that the deceased was suffering from some kind of poison and that he was treated for it and recovered in about twenty-four hours.

Still further as bearing upon the alleged conspiracy the same colored servant testified that some time in the fall of 1919 Mrs. Thomason went to see a carpenter in

Lexington by the name of Smith and in a conversation with him told him in substance that she had been directed to him and wanted to procure him to do some "dirty work," which was afterwards explained to be the assassination of her husband and that she offered to pay Smith the sum of five hundred dollars if he would undertake and perform the job. Smith also testified in substance to the same facts, stating that Mrs. Thomason paid him three visits while the matter was under consideration. That after she proposed to pay him five hundred dollars he notified a detective of the city, who instructed him to procure the money but that he did not succeed in doing so. However, Mrs. Thomason, in those conversations (according to the testimony of the witness) went to the extent of designating the place and time when the deed could be performed, it being on the pike between Lexington and Richmond near the Kentucky river at Clay's ferry and on a certain Friday when Mr. Thomason would be returning home at night. At the close of the testimony of those three witnesses (the colored girl, Smith and the hospital physician) defendant moved the court to exclude their testimony, apparently upon the ground that there was no testimony connecting the defendant therewith, but the court, upon the avowal of the Commonwealth's attorney that the connection would be made, overruled the motion. At the close of the Commonwealth's testimony the same motion was renewed but was again overruled upon a similar avowal. At the close of all the testimony the court sustained the motion, and before submitting the case to the jury instructed it in broad and positive language (of the comprehensiveness of which there is no criticism) to not regard any of the testimony of the servant girl in reference to the poisoning incident or in reference to the visits to and conversations with the witness Smith, and excluded entirely all of the testimony of the hospital physician and of Smith, and told the jury that the defendant had not in any manner been connected with either of the transactions.

Taking up now in their order the grounds urged in this court for a reversal it is insisted under number (1) that the Commonwealth's attorney in his closing argument to the jury made prejudicial reference to the excluded testimony of the witness Smith which occurred in a colloquy between the Commonwealth's attorney and the attorney for defendant. According to the bill of exceptions what occurred upon that subject was this:

"Col. Allen (Commonwealth's attorney): Mr. Kemper tells you that the court threw Smith out the window—the court did not tell you— Mr. Kemper: We object to any statement relative to the conspiracy. Col. Allen: The court did not tell you it was unworthy testimony, the court did not kick it out the window—but the court did tell you not to consider that and that you should not consider it as conscientious men, but I do say the court did not open the window and throw little Smith out—as Kemper says he did— Mr. Kemper: We object to the statement. Col. Allen: Mr. Kemper says it was unworthy testimony, that the court so instructed you. The court did not instruct you it was unworthy testimony—the court instructs you— Mr. Kemper: We object to the statement. Col. Allen: I can't say that there was a conspiracy between him and Mrs. Thomason; I can say that there was a telephone communication that morning and that he knew he would be in town that morning—"

The colloquy continued, in which Col. Allen made reference to the telephone communication on the morning of the killing as testified to by the colored servant, and he referred to the knife found on the running board of the automobile and ventured the suggestion that it might have been dropped there by Mrs. Thomason. He further proceeded to comment on the fact that the defendant did the shooting upon the main public street in the town when "thousands of people were going up and down" it; and in referring to the deceased he made the statement that he worked "night and day, week in and week out" to make a living for his family. We do not regard any of the complained of statements in the least prejudicial, unless it be those referring to the testimony of the witness Smith. The proper limitations within which attorneys (including prosecuting attorneys) in addressing the jury must confine themselves have been many times before this court and the general rule has been announced and approved that the argument must be confined to the testimony in the case, or to facts for which there is supporting testimony, and that it is improper to assert as a fact anything of a material and prejudicial nature which is not proven or for which there is no testimony supporting it. With reference to Commonwealth's attorneys it has been said that it was as much his duty to see that the guiltless were freed as that the guilty should be punished. But it has never been held to be incompetent for the attorney, including Commonwealth's

attorneys, to analyze the testimony, to explain the facts, provided the explanation finds support in the record although remote, and to reconcile from the testimony and all the proven circumstances if he can, contradictions appearing in the testimony. These privileges are not only allowable but are strictly within the discharge of the attorney's duty to his client and within the legitimate purpose of his employment. To deny them would circumscribe his functions to such an extent as to render it almost impossible for him to be of any service in the argument of his client's cause and to practically render it useless for him to attempt to do so. Some of the cases from this court supporting the above principles, both criticizing and upholding the particular argument under review, are: Keeton v. Commonwealth, 32 Ky. L. R. 1164; Houseman v. Commonwealth, 128 Ky. 818; Burton v. Commonwealth, 151 Ky. 587; Slaughter v. Commonwealth, 149 Ky. 5; Allen v. Commonwealth, 176 Ky. 475; Johnson v. Commonwealth, 188 Ky. 391, and numerous cases therein referred to. The courts and text writers likewise say that the objection to an improper argument by the attorney may be cured when it was only in reply to another one made by opposing counsel in discussing the same feature of the case. In the instant case the excerpt from the record which we have included conclusively shows that the colloquy between counsel consisted mainly in a mere battle of words and the Commonwealth's attorney was merely replying to a statement made by defendant's counsel in his argument referring to the testimony of Smith. It might be that the reference of the Commonwealth's attorney to the excluded testimony of that witness was improper had it been made independently and not in reply to argument of defendant's counsel. However, in the course of his remarks, as will be seen, he disclaimed the existence of any conspiracy between defendant and Mrs. Thomason and stated that "The jury can not even believe it." Considering together all of the objectionable remarks and the circumstances calling for them, we are unable to say that they were prejudicial. The remarks objected to with reference to the telephone communication on the morning of the day the killing occurred, and with reference to Mrs. Thomason possibly placing the knife where it was found, can not be said to be contrary to the license above set forth. They are deductions which might be legitimately drawn from all the facts and circumstances proven in the case and can not

be said to substantially prejudice the rights of the defendant.

The improper remarks by the court furnishing the foundation for ground (2), urged for a reversal, consist mainly in statements by the court in response to objections made to that portion of the testimony of the colored servant detailing her conversation with Mrs. Thomason relative to the poisoned whiskey hereinbefore referred to. While the Commonwealth's attorney was interrogating the witness in regard to that subject the court asked: "Is the statement you are making now what Mrs. Thomason told you Mr. Welch told her? A. Yes." The court then remarked: "I don't think that is competent. I think it is competent to prove a concerted plan to poison him (Mr. Thomason) if it is a fact, but what this girl has said is not competent because it is mere hearsay." The witness was then asked: "What did Mrs. Thomason say to you after her talk with Welch over the telephone as to her part in this poisoning?" The question was objected to and the court remarked: "If she (Mrs. Thomason) was to take any part in the conspiracy or plot to poison him, her part of it, I think is competent." Neither statement of the court was objected to by defendant's counsel and for this reason alone we might dismiss further consideration of this ground, unless the remark was so dangerously prejudicial as to authorize our interference. But we do not regard the remarks of the court as possessing such dangerous tendencies; in fact the connection in which they were made could not possibly have affected the jury prejudicially toward the defendant. Each of them purported to state only an abstract principle of law highly pertinent to the situation, and in the first statement the court expressly said that the offered testimony was incompetent and the second one at least impliedly said that if the testimony was insufficient to connect the defendant with the statements or conduct of Mrs. Thomason it was inadmissible. These considerations, together with the fact that the entire evidence with reference to the poisoned whiskey was eventually withdrawn from the consideration of the jury, relieved the court's remarks of any prejudicial effect even if they could otherwise be considered so.

Under the third ground urged for a reversal it is vigorously insisted (a) that the proven declarations and conduct of Mrs. Thomason, the alleged co-conspirator of the defendnat, with reference to the poisoned whiskey

and her conversations with the witness Smith were irrelevant and highly prejudicial, and (b) that, although they were finally withdrawn from the consideration of the jury, it was prejudicial to let the testimony remain in the case until the taking of proof was closed, and that the court should have excluded that testimony when the Commonwealth closed its case in chief. Manifestly that testimony was admitted under the conspiracy charge in the indictment and counsel concede that if the defendant had been connected therewith there could be no objection urged to it. In the establishment of a conspiracy so as to make a defendant responsible for the acts and conduct of his co-conspirator much latitude is allowed. In 12 Corp. Juris 634 on this subject the text says: ''The jury should have before them and are entitled to consider every fact which has a bearing on and a tendency to prove the ultimate fact in issue and which will enable them to come to a satisfactory conclusion. The government has a right to show the whole history of the conspiracy from its commencement to its conclusion. And it is no objection that the evidence covers a great many transactions and extends over a long period of time.'' To the same effect are, 6 Amer. & Eng. Ency. Law, 2nd edition, 869; Gabbard v. Commonwealth, 159 Ky. 634; Daniels v. Commonwealth, 154 Ky. 601; Gambrell v. Commonwealth, 130 Ky. 519; Owens v. Commonwealth, 181 Ky. 381, and Morgan v. Commonwealth, 188 Ky. 458. This rule as approved by this court is thus stated in the opinion in the Gambrell case: ''A conspiracy is almost necessarily established by the welding into one chain of a number of links, each in itself inconclusive and insufficient to prove the conspiracy, but, when connected and examined as a whole, sufficient to show it.'' In thus permitting the testimony to take a wide range in conspiracy cases it is not infrequent to allow the introduction of declarations and conduct of an alleged conspirator before there is any proven connection between him and the defendant, but always followed by the exclusion of such testimony if the Commonwealth fails to connect the defendant with it. Ball v. Commonwealth, 125 Ky. 607; Allen v. Commonwealth, 26 Ky. L. R. 807, and 16 Corpus Juris, 648, 649, 852, 865 and 866. The text of the last cited authority on page 865 in treating of this subject says: ''The mere fact that offered evidence is not full and complete within itself, but forms only a link in the chain of evidence so that it will have to be supplemented by other evidence in order to avail the

party offering it, may not render such evidence incom-
petent or inadmissible; and the prosecution should not
be called on to establish a negative as a predicate for the
introduction of testimony. But where the admissibility
of offered evidence depends upon the proof of other facts
not in evidence, it should be accompanied by an offer to
prove those facts, and the court may properly exclude it
until preliminary proof of such facts is made; or it may
admit the evidence on a promise made by the party or
upon the express requirement of the court, that proof of
facts on which the admissibility of the evidence depends
subsequently shall be made, unless its introduction out of
its regular order is likely to be prejudicial to defendant.''
On page 648 (same volume) after stating the general rule
to first show the existence of the conspiracy before in-
troducing acts or declarations of a co-conspirator, the
text says, ''But the rule in this respect is not absolute or
unyielding, and sometimes, for the sake of convenience,
evidence of the acts and declarations of the alleged con-
spirators is admitted before sufficient proof to the con-
spiracy is given, especially where the conspiracy must be
proved, if at all, by circumstantial evidence necessitating
showing a large number of apparently independent facts
and circumstances, any objections with respect to the
competency of the evidence at the time when it was of-
fered being obviated by the subsequent introduction of
evidence establishing the conspiracy and thus rendering
it competent. Whether or not such a departure from the
strict order of proof shall be permitted is a matter rest-
ing in the discretion of the trial court, which is not sub-
ject to review except where an abuse of discretion is
clear.'' In the Ball case, this court had before it the
identical question presented here and in disposing of it
said: ''Appellant complains that, as no evidence of a con-
spiracy was shown, the trial court erred in permitting the
witnesses, Fuson and Riley, to testify as to the conduct
and statement of C. D. Hall, made in Middlesboro in the
office of Riley and in the presence of Jack Bolen a day or
two before he was killed. This evidence was objected to
at the time it was introduced, and admitted over the pro-
test of appellant's counsel. Later the trial court, evi-
dently having some doubt as to whether a conspiracy had
been proven, withdrew this testimony from the jury, tell-
ing them that it had been introduced or admitted through
error, and that they must not consider it for any purpose
whatever. Appellant insists that this was most dam-

aging testimony, and that, although it was withdrawn from the jury, nevertheless it had already produced an effect upon the minds of the jurors from which they could not rid themselves, even though instructed by the court to do so. To this conclusion we can not agree. During the progress of a trial evidence is frequently offered which at the time is difficult for the trial judge to know whether it is competent or not. This is especially true in that class of cases where a conspiracy is charged, and it is only after the party offering such evidence has had an opportunity to introduce other proof or other evidence which would make it competent that the court may determine, from consideration of the whole, whether it is competent or not. If the evidence introduced later has had the effect of making the evidence complained of competent, then it should properly remain for the consideration of the jury, and, if in the opinion of the trial judge it has not done so, then it should be excluded.'' The complained of testimony bearing as it does upon the conspiracy features of the prosecution can not be said to be incompetent and irrelevant from the mere fact that it was introduced before the conspiracy was proven. In other words, the order of the introduction of the testimony is not of itself fatal to its admissibility. Neither is it denied by counsel that it is competent to admit such testimony provided it is withdrawn by the court at a proper time upon motion made for that purpose, but counsel insists that such proper time expires when the Commonwealth closes its testimony in chief. If that event should occur, say within two days after the introduction of the testimony, counsel seems to admit that if it is then withdrawn its introduction could not necessarily be complained of, but if such withdrawal was not made until the close of the defendant's testimony also, and within the same or less time its introduction would be fatal. The position of counsel in its last analysis is that the poisonous effect of the incompetent testimony does not result from the length of time it remained before the jury but rather from the stage of the trial at which the court acted upon it. Upon this precise point the text in 16 C. J., *supra*, 883, says: ''Where a motion to strike out incompetent evidence of a prejudicial character is properly made, the court should rule upon it at once and not wait until later, except that, where the admissibility of the evidence is dependent upon supplemental proof, it may delay its ruling until such supplemental proof has

been introduced or has failed." Cases referred to in note 25 to the text support it and this court in the case of Rutland v. Commonwealth, 160 Ky. 77, announced a similar principle. In that case a witness for the Commonwealth gave testimony on Saturday during the progress of the trial which was incompetent as and when given, but it remained with the jury until the following Monday, when the Commonwealth attempted to strengthen it by reintroducing the witness, but the court after a re-examination of the witness on Monday excluded his entire testimony,' including that given on the Saturday previous. Defendant complained on appeal that it was highly prejudicial to permit the incompetent testimony to remain with the jury from Saturday until Monday. In other words that the court should have acted upon the objections to the testimony when it was introduced on Saturday, but this court in disallowing the contention said: "Appellant complains of prejudicial error, for the reason that the testimony given on Saturday remained with the jury until Monday before it was excluded; but we do not think that this was error sufficient to justify the reversal of the conviction. The language in which the court withdrew from the jury the testimony of this witness was such that we cannot believe they did not understand it, and there was nothing in the testimony withdrawn so damaging that its remaining with the jury from Saturday to Monday before being excluded would have induced a verdict of guilty in the absence of evidence of guilt." It is insisted in the instant case, however, that the added reasons therein given for overruling the contention that, "there was nothing in the testimony withdrawn so damaging. that its remaining with the jury from Saturday to Monday before being excluded would have induced a verdict of guilty in the absence of evidence of guilt" is wanting in this case, since the complained of testimony here did possess such damaging characteristics. There is nothing in the excerpt from the opinion indicating that the ruling of the court would have been otherwise if the incompetent testimony there involved was of the same damaging quality as that complained of in the case before us. We do not agree with counsel, however, that the damaging effect of the testimony here involved, if any, was increased between the time of the closing of the Commonwealth's testimony and the closing of the testimony in the entire case, for, as said by the court in the Rutland case, "The language in which the court withdrew from the jury

the testimony of this witness was such that we can not believe they did not understand it.'' The language employed by the court in this case in withdrawing from the jury the complained of testimony is so broad and clear as to leave no doubt in the minds of the latter as to the court's purpose and intention. The jury was told that it could not consider the withdrawn testimony for any purpose whatever, and we have been unable to find a case from this court holding that under similar circumstances a reversal should be ordered from the mere fact that the testimony was not withdrawn sooner than it was. If it should be accepted as true that the court was technically in error in not acting upon the motion either when made, or at the furthest, when the Commonwealth closed its testimony, we would then have to hold that such error was so prejudicial to the substantial rights of the defendant as that his trial was not an impartial or fair one. After a careful consideration of the entire case we find ourselves unable to do this.

As said in a former part of this opinion the testimony was of such nature and variety as to support a verdict of acquittal, or one of voluntary manslaughter, or one of murder, dependent upon which witness or set of witnesses and what circumstances the jury believed. After hearing all of it and observing the deportment of the witnesses on the stand it returned the latter verdict and we have been unable to find any error sufficient to authorize us to disturb it.

Wherefore the judgment is affirmed. Whole court sitting.