[Crim. No. 1315. Second Appellate District, Division Two.—June 17, 1926.]

THE PEOPLE, Respondent, v. CHARLES Z. STEVENS et al., Appellants.

[1] CRIMINAL LAW—CONSPIRACY TO KIDNAP—OVERT ACT—EVIDENCE.—In a prosecution upon an indictment charging appellants and another with conspiracy to kidnap a certain named person, the evidence was insufficient to prove against appellants the commission of an overt act alleged in the indictment, where the evidence relating to such overt act, by the ruling of the trial court, was

received against the defendant alone who was acquitted, and was thus expressly excluded as to appellants.

[2] ID.—CONSPIRACY—OVERT ACT—PLEADING.—In alleging an overt act in conspiracy cases it is sufficient to charge that the act relied upon was performed in furtherance or in pursuance of the conspiracy.

[3] ID.—SPECIFIC INTENT — PLEADING — EVIDENCE — WAIVER. — In such prosecution, the fact that the indictment, in addition to alleging that in pursuance of the conspiracy to kidnap a certain overt act was committed, averred that the overt act was performed with a specified intent, and the further fact that the intent so alleged was not proved by the evidence but a different intent was shown, did not entitle the appellants to a reversal, where no prejudice or injury to the rights of appellants could have resulted from a mere failure to prove the specific intent alleged, and the appellants did not object to the evidence showing a different intent on the ground of variance.

[4] ID. — CONSPIRACY — ACT OF DEFENDANTS STATIONING THEMSELVES BEFORE CERTAIN PREMISES—OVERT ACT.—In such prosecution, the act of appellants in stationing themselves before certain named premises was an overt act within the meaning of the statutes upon the subject of criminal conspiracy.

[5] ID.—DISCUSSION OF PLANS TO KIDNAP OTHERS—TIME OF—EVI. DENCE.—In such prosecution, the trial court properly received evidence to the effect that appellants, considerably prior to mentioning the person named in the indictment as a victim of kidnaping, had discussed plans for the kidnaping of other persons, where such evidence, although remote in time and perhaps in effect, nevertheless tended to prove the formation of the conspiracy.

[6] ID.—CONSPIRACY—FORMATION OF—EVIDENCE.—There is no valid objection to evidence in conspiracy cases which tends to show, step by step, the gradual formation of a criminal concord in the minds of those charged with the illicit combination, merely because the evidence begins at a time long anterior to the wrongful meeting of minds; it is necessary only that the evidence, in all its parts, tends to prove the formation of the conspiracy.

[7] ID.—INTENT—EVIDENCE.—The purpose of the evidence in conspiracy cases is to establish a mental state—an illicit concord of the minds of several persons.

[8] ID.—CONFESSION—EXTENT OF USE OF.—In such prosecution, where the trial court received in evidence a signed confession of one of the appellants in the form of question and answer, there is no merit in the argument that it "could only have been used for

5. See 5 Cal Jur. 518; 5 R. C. L. 1087.
6. See 5 Cal. Jur. 516; 5 R. C. L. 1088.

the purpose of refreshing the recollection of a witness who might be interrogated concerning the subject of the conversation."

[9] ID.—DUTY OF JURORS—INSTRUCTIONS.—In such prosecution, there was no error in instructing the jury that "The importance of your duties requires that you consider the rights of the people of the State of California to have the laws properly executed, and that it is with you, citizens selected from the county, that finally rests the duty of determining the guilt or innocence of those accused of crime, and unless you do your duty, laws may as well be stricken from the statute books."

[10] ID.—CORPUS DELICTI—EVIDENCE—INSTRUCTIONS.—In such prosecution, the trial court did not err in giving the following portion of an instruction: "*Prima facie* evidence of the *corpus delicti* is sufficient; and it is for the court to say whether there is sufficient evidence of the *corpus delicti* to go to the jury, precisely as in the case of any other material fact."

[11] ID.—OVERT ACT—INSTRUCTIONS.—In such prosecution, if it be conceded, without deciding, that a portion of an instruction to the effect that an overt act is an "outward act done in pursuance and manifestation of an intent or design, the mere design or intent not being punishable without such act," is subject to the objection that it does not follow from the definition contained in the instruction that the act must be one which is done to effect the object of the conspiracy, the objection falls to the ground where the jury was told by other instructions that if it found beyond a reasonable doubt that the conspiracy was proven and that either of the overt acts alleged in the indictment was committed by the defendants "in pursuance of said conspiracy" or "in furtherance of said conspiracy," it was the duty of the jury to convict.

[12] ID.—GIVING AUTHORITY FOR INSTRUCTION—ABSENCE OF ERROR.— In such prosecution, the fact that the trial court gave Webster's Unabridged Dictionary as authority for the definition of the term "overt act" contained in an instruction was not error, where the instruction itself was correct; and furthermore appellants are in no position to make such an objection where several instructions which were proposed by them and which were given by the court are found in the record with authority for their correctness appended to them.

[13] ID.—CONSPIRACY—SUFFICIENCY OF EVIDENCE.—In such prosecution, there was sufficient evidence from which the jury could have inferred that the conspiracy was proven.

---

9.   See 8 Cal. Jur. 374.

[14] ID.—INSTRUCTION—FORM OF ASSIGNMENT OF ERROR—APPEAL.—In such prosecution, there is nothing for the appellate court to decide with reference to an instruction given by the trial court, where only the instruction is quoted, with the statement that it was erroneously given.

(1) 12 C. J., p. 638, n. 80, 83.    (2) 12 C. J., p. 624, n. 38, 39. (3) 12 C. J., p. 627, n. 67, 72; 17 C. J., p. 55, n. 99.    (4) 12 C. J., p. 550, n. 63, p. 551, n. 67, 72, p. 552, n. 79.    (5) 12 C. J., p. 633, n. 45, p. 637, n. 74, 75; 16 C. J., p. 589, n. 18, p. 591, n. 33.    (6) 12 C. J., p. 633, n. 42, 47, p. 634, n. 53, p. 635, n. 54, 55, 56, 57, 58. (7) 12 C. J., p. 549, n. 59, p. 634, n. 52.    (8) 12 C. J., p. 636, n. 63; 16 C. J., p. 732, n. 63.    (9) 16 C. J., p. 960, n. 58, 63, 64, 65, 66, 67. (10) 16 C. J., p. 932, n. 17, p. 1050, n. 84, p. 1053, n. 93.    (11) 12 C. J., p. 641, n. 16; 16 C. J., p. 1049, n. 82.    (12) 16 C. J., p. 1031, n. 83; 17 C. J., p. 210, n. 94, 95, p. 341, n. 82.    (13) 12 C. J., p. 638, n. 80.    (14) 17 C. J., p. 181, n. 38, p. 184, n. 77, p. 185, n. 85.

APPEAL from a judgment of the Superior Court of Los Angeles County and from an order denying a new trial. Victor R. McLucas, Judge. Affirmed.

The facts are stated in the opinion of the court.

Hewitt, Ford, Crump & Penn and Hewitt, Ford & Crump for Appellant Stevens.

John A. Holland for Appellant Holcomb.

U. S. Webb, Attorney-General, and H. H. Linney, Deputy Attorney-General, for Respondent.

WORKS, J.—Defendants were charged with a conspiracy to kidnap Mary Fairbanks, known also as Mary Pickford. Defendant Wood was acquitted. Defendants Stevens and Holcomb were convicted. The convicted defendants appeal from the judgment and from an order of the trial court denying their motion for a new trial.

[1] After charging the formation of the conspiracy the indictment set forth the following allegation, as an averment of one of the overt acts relied upon for a conviction: That "in pursuance of such conspiracy, the defendants did, on or about the 5th day of May, 1925, cause the said

14. See 8 Cal. Jur. 546.

Adrian J. Wood to purchase a revolver to be used for the purpose of intimidating the said Mary Fairbanks, also known as Mary Pickford, and compelling her to submit to such taking and restraint.'' It is contended by appellants that the evidence was insufficient to prove against them the commission of the overt act thus alleged. The attorney-general concedes that this point is well taken, and after an examination of the record, we are satisfied that the concession is properly made. There are several reasons which justify this action of the attorney-general, but one only of them need be stated: All evidence concerning the purchase of the weapon mentioned in the indictment was received for some reason against defendant Wood alone. In other words, that evidence, by the ruling of the trial court, was expressly excluded as to appellants.

The only other overt act charged in the indictment was thus set forth: That ''in pursuance of such conspiracy . . . the said defendants did, on the 30th day of May, 1925, cause said Charles Z. Stevens and Claude Arthur Holcomb to station themselves in an automobile in front of the Mary Pickford Studio . . . with intent then and there to seize, capture and restrain the said Mary Fairbanks, also known as Mary Pickford, and thereafter keep her under restraint until'' a ransom for her release was paid. [2] It is undoubtedly the law that in alleging an overt act in conspiracy cases it is sufficient to charge that the act relied upon was performed in furtherance or in pursuance of the conspiracy (*People* v. *George*, 74 Cal. App. 440 [24 Pac. 97]; 12 C. J. 624). [3] Here, however, the pleader who drew the indictment did more. He charged the specific intent with which the act was performed. It is·admitted by the attorney-general—and a perusal of the record demonstrates that no other course could properly have been taken by him—that there is a lack of evidence to prove the specific intent alleged. The act was sufficiently proven, beyond a doubt, but the intent with which the act was performed was shown to have been entirely different from that which was charged. Upon this state of the record it is insisted by appellants that the evidence fails to support the charge as laid. It is said by them that, the prosecution having elected to color the charge that the overt act was done in pursuance of the conspiracy by the allegation that it was

committed with a specified intent, the prosecution must have proven that intent, and could rely on no different intent. On the other hand, respondent contends that the allegation that the overt act was committed with a specific intent on the part of the conspirators may be disregarded as surplusage, and that the charge is satisfied by any proof that the act was performed in pursuance of the conspiracy. These contentions we shall proceed now to examine.

The question as to what allegations in an indictment or information may be regarded as surplusage has been before the courts of this state in several cases. In one of these the defendant was charged with the crime of procuring and allowing a certain individual to be registered as a voter in the precinct register of a precinct in which he was not entitled to be registered. The defendant was a deputy registrar of voters and it was alleged in the information that he committed the crime with which he was charged "as such deputy registrar of voters." Under a chain of circumstances which it is not necessary here to state it became proper for the court to determine what was the effect of the allegation. It was said in the opinion that "the charge in the information that 'as deputy registrar' defendant committed the offense is the merest surplusage. It was meaningless in averment and unnecessary in proof. The statute is not directed against official misconduct, nor limited in its application to public officers. '*Every person* who wilfully causes, procures, or allows' false registration is punishable under it. Every act embraced within its terms may be done by a private citizen as well as by a public officer, and the official character of the offender under this law is of no possible importance" (*People* v. *Sternberg*, 111 Cal. 3 [43 Pac. 198]). It must be confessed that there is great doubt whether this adjudication gives us material aid in determining the question which is here presented for our consideration. The specific allegation in the information under scrutiny in the cited case to the effect that the defendant committed the crime with which he was charged as a deputy registrar of voters was swallowed up in the general allegation that he committed it, for the statute denouncing his crime was directed at all persons and not merely at public officials. The specific allegation therefore added nothing to the charge, nor did it explain

or color it. Here, however, the specific allegation that appellants stationed themselves outside the Mary Pickford Studio with intent then and there to kidnap her is not included in the general allegation that they so stationed themselves in pursuance of the conspiracy. The specific allegation, therefore, in a sense makes addition to and colors the general allegation. We state these differences between *People* v. *Sternberg* and the present case for the purpose of indicating more clearly the point which is before us for determination. There are other decisions of our courts which come nearer to the question that confronts us. In one of them the defendant was charged with arson. It was averred in the information that the building which was alleged to have been burned was the property of a certain individual. There was no proof of the allegation of ownership and it was contended, because of the omission, that the evidence was insufficient to sustain the conviction. The court said: "The rule, with reference to the proof required to support an information or indictment, is that every fact or circumstance necessary to constitute the crime charged is material, and must be alleged and proved. But the allegation of a fact or circumstance not legally essential to the charge is mere surplusage, and may be disregarded. There are allegations, however, not necessarily essential, and which may be dispensed with; but when they are laid in the information or indictment they become material, and must be proved in all cases when descriptive of the identity of that which is necessary to the charge. In the case before us the name of the owner, although alleged, was immaterial, because it was not a necessary part of the description of the crime charged, therefore not necessary to be proved" (*People* v. *Handley*, 100 Cal. 370 [34 Pac. 853]). In another case the defendant was charged with the larceny of a steer and the information alleged that it was taken from the possession of a particular individual. The court said: "The allegation in the information that the animal was taken 'from the possession of one George L. Wallace' may be treated as surplusage. . . . The possession of the owner . . . was neither a necessary element of the offense nor any part of the description of the property alleged to have been taken. . . . Its presence in the information neither added to nor detracted from the force

and effect of that pleading" (*People* v. *Hutchings,* 8 Cal. App. 550 [97 Pac. 325]). A similar question has arisen in two burglary cases. In the first of these the court said: "There was a request for an instruction directing the jury to acquit on the ground of variance between allegation and proof in this: The information charged a burglary in entering, etc., a building at St. Helena, in the county of Napa, while the proof was that the building is situated a mile and a half from St. Helena. It does not appear that a designation of the local vicinage of the building was at all important for its identification, and unless necessary for that purpose it was surplusage to allege or prove its situation further than that it was in the county of Napa" (*People* v. *Geiger,* 116 Cal. 440 [48 Pac. 389]). In the second burglary case occurs language which seems at first glance to support the contention of appellants here: "It may be admitted that where the prosecution does particularize by specific allegation the location of the place where a burglary has been committed, or as to the particular person owning the building, they cannot show that the ownership was otherwise than that alleged or the location different, without rendering their case open to the objection as made by appellant here of a variance between the allegations and proof" (*People* v. *Redman,* 39 Cal. App. 566 [179 Pac. 725]). It seems, for several reasons, that the expressions in this latter case cannot influence our decision of the question here presented. In the first place, taking the entire context of the opinion, the language is plainly obiter. Then, too, it is possible that the court "admitted" the point only for the purpose of argument and did not intend to express a decided view upon it. Further, the language quoted seems not to accord with the decision of the supreme court in *People* v. *Geiger, supra,* for there the court expressly decided that it was surplusage "to allege or prove" more than that the burglarized building was in the county of the jurisdiction, where the allegation was that it was in a certain town and the proof showed that it was a mile and a half from the town.

From a review of all these authorities it seems plain that the point now urged by appellant would be fruitless if the prosecution had made no attempt whatever to prove any specific intent with which appellants stationed themselves

outside the Mary Pickford Studio. This much seems to be settled by the rulings in *People* v. *Handley, supra,* and *People* v. *Hutchings, supra.* Under these decisions and under the general principles upon which they are based, we can perceive no prejudice or injury to the rights of appellants which could have resulted from a mere failure to prove the specific intent with which it was alleged that two of the parties to the conspiracy had stationed themselves outside the studio. If the prosecution had deserted absolutely the allegation in making its proof, and had attempted to prove no other specific intent, we do not see how appellants could have been misled by the mere fact that a specific intent was alleged. But a specific intent other than that alleged was proved by the prosecution. One witness testified to an admission by appellant Holcomb that he "went out to the studio . . . to look for Mary Pickford." This statement was received as against Holcomb alone. Appellant Stevens made a statement to the police after his arrest, in the form of question and answer. It was afterward reduced to writing and was signed by him. The following excerpts are made from the statement, which was received as to Stevens alone: "Q. What did you go out there [to the studio] for? . . . A. Well, it was possibly to see if Mary Pickford came out out there. Q. I don't want any possibility about this. I want the truth. A. To see if she did come out. . . . It was to get information; further than that I can't say. Q. Get information for what? A. As to her movements. Q. What was the purpose of getting information as to her movements? You had planned to kidnap her, hadn't you? A. Why, if it was possible. . . . Q. What were you doing out there? A. Just as I stated here, I went out to look over the ground. Q. To see what possibilities were of kidnaping her? A. Yes. . . . " In a similar statement made by appellant Holcomb, and received as against him alone, the following occurs: "Q. And what were you doing out there [at the studio] at the time of your arrest? A. Well, we went out there to see if Mary Pickford would come out and go home."

The presence of this showing in the record would seem to offer a question different from those treated in *People* v. *Handley, supra,* and *People* v. *Hutchings, supra.* The point which appellants advance seems now to approach more nearly that decided in *People* v. *Geiger, supra,* but we need not

pause to say whether the present question is ruled by that case or whether there is such a difference between the respective sets of circumstances in the two cases that the rule stated there is inapplicable here. We have already seen that the rights of appellants could not have suffered if the prosecution had made no proof whatever of a specific intent with which appellants stationed themselves before the studio, and had relied alone upon the proof of the conspiracy as a basis for an inference by the jury that the act of the conspirators in stationing themselves before the studio was one in furtherance of the conspiracy. That being so, no more than a question of variance was presented when the first item of proof was offered which tended to prove a specific intent different from that alleged in the indictment, if we grant for the sake of argument, without deciding, that such a question then arose. No objection was made to the specific items of evidence which we have quoted from the respective statements of appellants, nor does the record show that the question of variance was presented to the trial court at any time or in any way. This situation is exactly met by a case lately decided by this court. We said in the opinion then rendered: ''It is insisted that the judgment should be reversed for the reason that the charge was that the defendants attempted to rob T. Tschanz, while the evidence shows that the name of their victim was Simon Tschanz. This variance appears from the record, it is true, and if we concede, without deciding, that it was a material variance, we at once observe that no objection was made at the trial to any of the evidence on the ground of variance, nor in fact was the point in any manner presented at the trial, or on motion for a new trial. It has been determined, under a statute to the effect that only questions presented at the trial can be reviewed on appeal, that the claim made in a criminal case that there was a variance between charge and proof cannot first be presented to the appellate court (*State* v. *Padilla*, 18 N. M. 573 [139 Pac. 143]), and in this state it has been held many times that the point that there is a variance between pleading and proof in civil cases cannot first be made on appeal (*Stockton C. H. & A. Works* v. *Glens Falls Ins. Co.*, 121 Cal. 167 [53 Pac. 565]; *Robson* v. *O'Toole*, 60 Cal. App. 710 [214 Pac. 278]). In the opinions of the two cases cited, and in the many others referred to in them, the reason given for the rule in civil

cases is that an amendment of pleadings may be allowed and justice thus be done if the point be made in the trial court. There appears to be an equally cogent reason for the application of the principle in criminal cases. If the question be raised in the trial court the pending charges may be dismissed and a new indictment be found, or a new information be filed, thus aiding the administration of substantial justice and wiping out what are sometimes exceedingly technical defenses. It is to be remembered, too, that the general rule is that courts of review pass only upon questions presented at the trial. This rule has often been applied in criminal as well as in civil cases (*People* v. *Taminago,* 35 Cal. App. 238 [169 Pac. 696] ; *People* v. *Walton,* 53 Cal. App. 35 [199· Pac. 824] ). We therefore decide that the point that there was a variance between charge and proof was waived'' *People* v. *Gonzales,* 69 Cal. App. 609 [231 Pac. 1014]. See, also, *Swallow* v. *Francisco,* 73 Cal. App. 692 [239 Pac. 95] ). We conclude that the point made by appellants, and arising from the allegation in the indictment that one of the overt acts charged was committed with a specific intent, is without merit.

[4] It is contended by appellants that their act in stationing themselves before the Mary Pickford Studio was not an overt act within the meaning of the statutes of this state upon the subject of criminal conspiracy. In disposing of this point we deem it sufficient to refer to *People* v. *George, supra.* We think the act here shown was an overt act within the rules laid down in that case. This conclusion presupposes, of course, that the conspiracy here charged was formulated before appellants made their trip to the studio gates. Whether it had been formulated before that event is a point later to be considered.

[5] The prosecution proved by various witnesses that defendants, during a considerable period of time, had discussed plans for the kidnaping of several celebrities of the cinema world and several children of wealthy residents of Los Angeles. Some of these discussions occurred before Mary Pickford was mentioned as a possible victim of the rapacity of defendants. One of the witnesses who testified to these earlier occurrences was one Harney. His testimony, which was received over the objections of appellants, went back more than two years, the Pickford plot having finally

culminated in May of 1925. He testified that in December, 1922, or in January, 1923, appellant Stevens "mentioned of taking a party and holding until he collected the ransom"; that the "party" then spoken of was Pola Negri; that conversations between him and Stevens on the same subject "went on for probably one year" and that at some time during the conversations Mary Pickford was mentioned as a possible victim of a kidnaping enterprise; that Stevens said that she could be picked up "either at her house, as she was coming home, or on the road," and that she could be held until her husband, Douglas Fairbanks, paid a ransom for her release; that in March or April, 1925, Stevens asked the witness if he remembered their earlier conversation about kidnaping; that Stevens then said that he had talked about the same thing with appellant Holcomb; that he and Holcomb had "planned out where they could get the party, the subject, and didn't name any names at all, just the subject"; that Stevens soon thereafter mentioned Jackie Coogan as a possible victim of a kidnaping plan and said that he, Holcomb, and defendant Wood were considering such a plan; and that Stevens, in April, 1925, said he had given up the plan.

It is now contended that the trial court erred in receiving the testimony of Harney, but the contention is most sparingly argued and no authority is cited to support it. We shall, however, assume that the question is fully presented and argued, and shall therefore decide it. As a preliminary to a disposition of the point it is to be observed that no contention is made that the evidence was improperly received as against Holcomb. The general question is presented only that it was not admissible at all. We do not decide, of course, that it was not receivable against Holcomb, but merely point out that such a question is not before us.

A conspiracy may have a very small and very remote beginning. Like a gigantic member of the forest, it may originate in a tiny tendril, which requires a long time and a persistent nurture to be developed into the matured monarch of the grove. It is for this reason that it is said in a standard publication that, in conspiracy cases, "it is no objection that the evidence covers a great many transactions and extends over a long period of time, that it may

show another crime, that the acts, evidence to show which is offered, occurred some time before the alleged formation of the conspiracy, provided, however, that the facts shown have some bearing on and tendency to prove the ultimate facts at issue'' (12 C. J. 635). An examination of the record before us shows that the entire evidence in the cause, including the testimony of Harney, discloses a practically continuous chain of circumstances, commencing at least as early as the date of the events related by Harney and ending with the arrest of appellants at the gate of the Mary Pickford Studio. This chain of circumstances showed the gradual unfolding of the plot to kidnap the individual for whom the studio was named. To employ again the simile of which we have already made use, it showed the gradual growth of the illicit enterprise from tendril to maturity.

[6] In our opinion there is no valid objection to evidence in conspiracy cases which tends to show, step by step, the gradual formation of a criminal concord in the minds of those charged with the illicit combination, merely because the evidence begins at a time long anterior to the wrongful meeting of minds. It is necessary only that the evidence, in all its parts, tends to prove the formation of the conspiracy. In a case in which, it is true, the only issue was as to the identity of one of the alleged parties to a conspiracy, the court said: ''From the nature of the crime itself it is difficult to prove a criminal conspiracy by direct evidence, and such conspiracies are most always proven by circumstantial and 'piecemeal' evidence; and in consideration of this fact in such cases great latitude must of necessity, be given the commonwealth in the production of its evidence'' (*Jenkins* v. *Commonwealth,* 167 Ky. 544 [3 A. L. R. 1522, 180 S. W. 961]). The opinion in this case, to our minds, correctly states a rule which fits the facts of the present controversy. In a civil action for damages wrought by a conspiracy it was said as to one of the defendants that ''it was immaterial when his acts or declarations occurred, if they related to the transactions out of which his liability arose'' (*Exchange Bank* v. *Moss,* 149 Fed. 340 [79 C. C. A. 278]). One court has said in another civil case, in quoting from an earlier opinion rendered in the same jurisdiction: ''And in the admission of cir-

cumstantial evidence upon a charge of conspiracy great latitude is allowed. The jury should have before them, and are entitled to consider, every fact which has a bearing on and a tendency to prove the ultimate fact in issue which would assist them in arriving at a satisfactory conclusion, and it is no objection that the evidence may tend to prove many different transactions extending over any particular period of time, provided that all the facts proven have some bearing on a tendency to prove the ultimate fact in issue. The limits to which evidence of this kind may be admitted should be left to the discretion of the trial court, and its ruling should not be disturbed, when the evidence admitted tends, even remotely, to establish the ultimate fact of conspiracy" (*Democrat Printing Co.* v. *Johnson,* 71 Okl. 128 [175 Pac. 737]). Practically the same rule is followed in the criminal cases of *Jelke* v. *United States,* 255 Fed. 264, and *Welch* v. *Commonwealth,* 189 Ky. 579 [225 S. W. 470].

[7] The purpose of the evidence in conspiracy cases is to establish a mental state—an illicit concord of the minds of several persons. Such being the question involved, the unfoldment of the evidence is to be governed by the rules which prevail in those cases in which the endeavor is to ascertain the sanity or insanity of an individual. The mental state of an individual may change slowly. The joint state of mind of conspirators, finally emerging into a criminal concord under the law of conspiracy, may develop gradually from a condition of innocence to one of the blackest guilt. Therefore, in addition to the cases above noted, we may justly rely, in support of our view, upon the well-known rule that in order to determine sanity or insanity— the mental state of an individual—an investigation into the mental activities of the subject under inquiry may reach back over a long period of time. This rule is so well known that we do not pause to cite the cases which announce and support it. On the whole we conclude that the evidence of Harney showed a proper part of the series of circumstances in which, by the verdict of the jury, appellants have become enmeshed. His testimony, although remote in time and perhaps also in effect, nevertheless tended to prove the formation of the conspiracy. It was admissible under the liberal rules touching upon the production of evidence in conspiracy cases.

[8]   As we have already observed, the trial court received in evidence a signed confession of appellant Stevens in the form of question and answer. It is contended that the contents of this paper were erroneously received, but in arguing the point appellants merely say: "At the most, this memorandum could only have been used for the purpose of refreshing the recollection of a witness who might be interrogated concerning the subject of the conversation." We can perceive no merit in this argument. By signing the paper Stevens made it his as fully as if it were a letter which a typist had produced from his dictation and to which he had appended his signature.

[9]   It is claimed that the trial court erred in giving the following instruction: "The importance of your duties requires that you consider the rights of the people of the State of California to have the laws properly executed, and that it is with you, citizens selected from the county, that finally rests the duty of determining the guilt or innocence of those accused of crime, and unless you do your duty, laws may as well be stricken from the statute books." It is said that by this instruction the jury was told that "laws should be stricken from the statute books if they do not convict" and that it was the duty of the jury to convict. This part of the instruction was not as carefully drawn as it might have been, but we think it contains language that saves it from the condemnation which is now sought to be placed upon it. The jury was told that the duty of its members was to see that the laws were properly executed. This language informed the jury, in effect, that it was to discharge its duties under the law as given in the entire instructions of the court. The jury was also told that it was its duty to determine the guilt or innocence of the defendants, and that, in effect, unless this duty was performed, laws might as well be stricken from the books. As thus viewed we think the instruction was proper. It was not greatly different in legal effect from some parts of the instruction approved by us in *People* v. *Selby*, 76 Cal. App. 715 [245 Pac. 792]. It must also be observed that the court gave the jury, in connection with and following the language upon which appellants base their claim of error, this further statement: "You should also ever keep in mind the importance to the accused of the result of your deliberations

and be just to him, as well as to the People of the State of California. Both the public and the defendant have a right to demand, and they do so demand and expect, that you will carefully and dispassionately weigh and consider the evidence and the law of the case and give to each your conscientious judgment; and that you will reach a verdict that will be just to both sides, regardless of what the consequences may be." This language, taken together with that to which appellants take exception, made the instruction eminently fair.

[10] Appellants also object to the following portion of an instruction which was given by the court: "*Prima facie* evidence of the *corpus delicti* is sufficient; and it is for the court to say whether there is sufficient evidence of the *corpus delicti* to go to the jury, precisely as in the case of any other material fact." Appellants admit that it was the duty of the court to determine what evidence was admissible to establish the *corpus delicti,* but they say that "it is the sole duty of the jury to determine the weight and the sufficiency of the evidence, and their instructions upon their duties should not have been confused by the court reading a lecture on what the powers of the court were." We cannot perceive, in the language to which appellants take exception, the evil which they see in it. The jury was merely informed that it was a function of the court to determine what was sufficient evidence of the *corpus delicti* "to go to the jury." Other instructions which went to the trial body plainly informed its members what were their functions and duty in dealing with all evidence which the court, in the exercise of its functions, permitted them to hear. We can see no error in the giving of the instruction to which objection is now made.

[11] The record shows the following, among the instructions given by the trial court: "You are instructed that an overt act in law is some act actually done in execution of a criminal intent as distinguished from mere threats or words, or an outward act done in pursuance and manifestation of an intent or design, the mere design or intent not being punishable without such act. Webster's Unabridged Dictionary." It is contended that the instruction was erroneous in that portion of it which follows the expression "mere threats or words," for the reason that "it does not

follow from this definition that the act must be one which is done to effect the object of the conspiracy." If it be conceded, without deciding, that this objection is tenable as directed alone at the particular language of the instruction which is sought to be condemned, we must at once observe that the objection falls to the ground in view of other instructions which were given. The jury was told, for instance, that if it found beyond a reasonable doubt that the conspiracy was proven and that either of the overt acts alleged in the indictment was committed by the defendants "in pursuance of said conspiracy" or "in furtherance of said conspiracy," it was the duty of the jury to convict. On the whole, we think the objection which appellants made to the particular language of the instruction which they have selected for their assault is not well taken.

[12] It is also objected that it was error for the court to give Webster's Unabridged Dictionary as authority for the definition of the term "overt act," for, it is said, the mention of this well-known authority gave a "false and misleading weight" to the instruction. The obvious answer to this objection is that if the instruction was correct—and appellants have not shown us that it was not—no damaging weight could be imparted to it by the statement of any authority for it, however weighty the authority itself might be. We doubt, however, whether the court gave to the jury the name of the dictionary as authority for the definition, or whether we are bound to assume that it was given merely because the title of the ponderous lexicon is affixed to the definition in the record. It is the usual custom to append to proposed instructions a list of the authorities which are relied upon as a sanction of their correctness. Many instances of the custom appear in the present record. These lists of authorities should not be given to the jury, of course, if we consider alone the fact that valuable time would be lost in such a course. If the name of the dictionary was read to the jury, however, it would appear that appellants have waived the right to urge the reading as error. Several instructions which were proposed by them, and which were given by the court, are found in the record with authority for their correctness appended to them. Appellants cannot object to a sin in others which they have themselves committed.

[13] Appellants contend that the evidence was insufficient to prove the conspiracy alleged in the indictment. Ordinarily we should meet such an objection by stating enough of the evidence in a cause to show that the point is without merit, but we do not here find such a course to be necessary. The record in this action consists of two thousand pages and we have read it in its entirety. We think it sufficient to state that there was ample evidence from which the jury could have inferred that the conspiracy was proven. It is inadvisable to spin out an already lengthy opinion for the purpose of demonstrating a thing which to us appears to be obvious.

[14] Appellants contend that a certain instruction given by the court was erroneous, without arguing the point or citing authority in support of it. Only the instruction is quoted, with the statement that it was erroneously given. Under such circumstances there is nothing for us to decide (*Maguire* v. *Cunningham*, 64 Cal. App. 536 [222 Pac. 838]).

Other points are made by appellants but they are answered in our discussion of questions which are treated above.

Judgment and order affirmed.

Finlayson, P. J., and Craig, J., concurred.

A petition by appellants to have the cause heard in the supreme court, after judgment in the district court of appeal, was denied by the supreme court on August 16, 1926.