[Crim. No. 1235.   Third Appellate District.—December 15, 1932.]

THE PEOPLE, Respondent, v. H. H. HARSHAW, Appellant.

U. W. Brown and Alva S. King for Appellant.

U. S. Webb, Attorney-General, and J. Charles Jones, Deputy Attorney-General, for Respondent.

THOMPSON (R. L.), J.—The defendant was charged with the murder of Pearl Frederick Harshaw with whom he had lived twenty years without the formality of marriage. He entered a plea of not guilty of the crime charged and also not guilty by reason of insanity. Separate trials occurred upon these issues. A jury found him to be sane at the time of the homicide. Another jury convicted him of the crime of murder of the second degree. He was sentenced to imprisonment at San Quentin state prison for the term prescribed by law. From this judgment the defendant has appealed.

It is contended that neither verdict is supported by the evidence, and that the court erred in giving to the jury a certain instruction warning them against failure to perform their duty.

The defendant and Pearl Frederick Harshaw lived together as husband and wife for twenty years without the ceremony of a marriage. Both of them had been previously married. It appears that neither of them had been divorced from their respective spouses. They moved from place to place seeking a living. They were employed chiefly in stock-raising and farming. They engaged in frequent quarrels. About two years prior to the homicide they had a settlement of property rights and thereupon separated. At this time Pearl Harshaw was given a ranch which was afterward sold for $3,000. The defendant received about $700 from the proceeds of this sale. Several months prior to the homicide they resumed their former relationship, living at the Senator Gun Club, which is situated on a game preserve near Colusa. When the money which she received from the sale of the ranch was expended, Pearl "sent her belongings and moved out" to the club-house without an invitation from or consent of the defendant. George Main, Jr., lived with them. He is a nephew of Pearl Harshaw, aged eleven years, of whom she was very fond. He is an intelligent boy. The defendant owned some stock consisting of horses, hogs and a span of mules. The deceased possessed a violent temper. Three times prior to the homicide

she assaulted the defendant with a butcher-knife. On one occasion she inflicted a severe scalp wound upon him with a butcher-knife. Once she fired at him with a rifle. The bullet passed through the crown of his hat. No provocation for these assaults appears in evidence. She frequently became enraged and used vile language toward him. She often threatened to kill him. She told others she would kill him. She accused him of associating with other women. She was jealous of him. Her threats to kill him were communicated to him. He feared her.

The defendant, Pearl Harshaw and the boy slept in separate beds on a screened porch of the club-house adjacent to the kitchen thereof. The defendant kept a loaded revolver in a stand near the head of his bed. He explained the presence of this revolver by saying that an unknown prowler had attempted to enter the house in the night-time several weeks prior to the homicide. The defendant was away from home during the night prior to the occasion of the fatal shooting. He arrived at home about 6 o'clock in the afternoon. A quarrel immediately ensued over his absence during the night. He insisted that he remained at a ranch where he was trying to purchase some hogs. He also aroused the ire of Pearl Harshaw by suggesting that he intended to sell the mules. They quarreled at the dinner-table and throughout the evening. She refused to permit the sale of the mules and she charged him with staying all night with another woman. She cursed and threatened him. He testified that she said: " 'You s—— of a b——, you have been laying out (with a woman) all night.' I said, 'No Pearl, I have been up at the other ranch, stayed all night up there and aimed to get here in time for breakfast.' She said, 'You are a g—— d—— liar, you s—— of a b——, you have been laying out all night and I am going to kill you.' " Mr. McCullough, who was called as a witness for the prosecution, corroborated this theory that Pearl Harshaw was jealous of another woman. He testified regarding a conversation which occurred with the defendant, as follows: "Well, he told about .... staying with some woman, staying at some woman's ranch." No further evidence of his asserted disloyalty appears in the record.

It appears that Pearl Harshaw continued to rave at the defendant after they had retired. They were sleeping in separate beds. The boy had gone to sleep. The defendant testified, "I thought she must be terribly unreasonable if I couldn't reconcile her." He then arose and going to the boy's bed shook and aroused him, asking that he remain awake. He explained this act by saying he thought the boy might help pacify his aunt. The defendant then returned to his own bed. Pearl Harshaw was in a rage. She cursed him, demanding that he "leave that kid alone and get back to bed". She got up, turned on the lights and hurried into the kitchen mumbling, talking to herself and threatening to kill him. Both the boy and the defendant saw her seize a butcher-knife from the table and hasten back to the sleeping porch. George Main, Jr., testified: "Mr. Harshaw woke me up, I should say, about 10 o'clock. . . . Mrs. Harshaw came out on the back porch and told him to 'leave that kid alone and get back to bed'. . . . I don't know what made me sit up in bed, but (I) happened to sit up and saw Mrs. Harshaw go through the dining-room—watched her until she went through the door into the living-room—then (I) looked at Mr. Harshaw and he was kneeling on his bed looking in the window, and he told Mrs. Harshaw not to come out, and she said, 'You s—— of a b——, I am not stopping; I am coming on.' Then she opened the door and took one step out . . . and he shot. . . . Q. Now, when you saw her coming out of the living-room, did she have a butcher-knife in her hands? A. She did. . . . She came through the room holding it like that (indicating point forward) and then she let it go back like that (holding it pointed backward and to the right). . . . Q. When she came through the door from the living-room on to the porch, you mean? A. Yes."

It is apparent the defendant did not plan to kill his companion. His evident purpose in firing at her was to prevent her from attacking him with the knife. She had often threatened to kill him. She had made several previous assaults upon him with deadly weapons. From the actual slashing of his scalp with a butcher-knife and firing upon him with a rifle, he had cause to fear her. She was enraged. She had been quarreling and threatening him

throughout the evening. She charged him with laying out with another woman. She suddenly got out of bed, turned on the lights, hastened into the living-room, where she armed herself with a butcher-knife and returned directly to him cursing and threatening him with the upraised knife. There is no evidence that the defendant previously inflicted injury upon or threatened violence toward her. He had never struck her. He lay quietly in bed watching her through the window. When she reached the porch, knife in hand, he seized the revolver and raising upon his left elbow he warned her against the threatened attack. He claims to have pleaded with her not to attack him. To this entreaty she replied with an oath, ''I am not stopping. I am coming on.'' Her conduct confirmed this threat. He then fired. The circumstances indicate that he did not even then intend to kill her. There were five loaded cartridges in the revolver. He fired but once. He did not aim at the most vital portion of her body. The bullet entered her left side above the pelvis. He evidently did not realize he had shot her. As she stood for a moment after the shot was fired, without advancing, he said, ''Don't come any further.'' If he had intended to kill her he would have fired again. She backed up and leaned for an instant against the door-jamb. Then she slumped to the floor, still clinging to the butcher-knife. Her nephew sprang from his bed. He turned her body over and took the knife from her hand. The defendant called to him to leave everything as it was. The boy then threw the knife upon the floor. At the request of the defendant George immediately went for a doctor. Within a brief period of time he returned with the sheriff and a doctor. They found the body of the deceased lying upon the floor where she fell. She was dead. The defendant lay by her side upon his face with one arm about her. He seemed to be trying to talk with her. The knife lay close by upon the floor. The revolver was on the foot of the bed. The sheriff testified as follows: ''He seemed to be talking to Mrs. Harshaw, . . . he recognized me; we have known one another for a long time, and he (the defendant) said, 'I think you are too late.' '' The sheriff then added, ''I asked him how it had happened, and he said, 'She was after me with a knife and I shot her'; he says, 'There

is the knife and there is the gun.' The knife was laying near the body of Mrs. Harshaw, and the gun was on the bed near the foot."

The defendant's story of the tragedy does not sound unreasonable. It has no perceptible flaws. Every essential circumstance of the affair, including the cursing, the threatening and the arming of the deceased with a butcher-knife, were corroborated by her own nephew, of whom she was very fond. It is natural to expect the boy to have related everything which would be favorable to the conduct of his aunt. The former attacks and threats of Pearl Harshaw which were related by the defendant are also corroborated by disinterested witnesses. Doctor Salter, who was called to treat the defendant for the scalp wound caused by her slashing him with a butcher-knife, testified that he found him with a serious infected scalp wound penetrating to the skull. He met Pearl Harshaw at that time and testified she admitted cutting him with the knife and that "She said she would kill the s—— of a b—— if he came at her again. Q. Did she show you the knife? A. She did." Mrs. Look, who lived near the home of the Harshaws while they resided near Meridian, testified that while she was keeping house for them during Pearl's illness, the deceased told her that once when the defendant was called "to the telephone, and was going through the dining room, she threw a small butcher-knife at him and it went through his shirt under his right arm. . . . She told me at the same time she shot at him as he was going around the garage. . . . She told me a number of times she would kill the s—— of a b——." When Mrs. Look warned her against attacking the defendant, she replied, "Don't you worry Lora, if there is anybody going to get killed it will be Harshaw, the s—— of a b—— hasn't got guts enough to kill me." Mrs. Cressa Main, the sister of the deceased, and the mother of the boy, George Main, Jr., who had lived with the Harshaws for a period of time, testified that her sister Pearl "had a high temper, she ran over all of us. . . . On more than one occasion she told me that she would kill him (the defendant), . . . cut him to pieces; she would cut his heart out." She admitted that she had heard them quarrelling; that Harshaw had driven her frantic with nagging and that, in shooting her sister, he had killed

the best friend he had. But she also said that he was a good man and had treated her sister with kindness.

All of these numerous threats of the deceased were communicated to the defendant prior to the homicide. There is ample evidence to indicate that he feared her. He was fifty-eight years of age, and in poor health.

The evidence of the defendant and George Main, Jr., regarding the circumstances of the homicide stands uncontradicted and unimpeached. Their testimony is quite convincing. If they told the truth, then the defendant acted only in necessary self-defense. The effort to contradict some of the other corroborating witnesses was a failure. In an attempt to prove a premeditated design on the part of the defendant to kill his companion, Roy Tyler was asked, "Q. Did he (the defendant) tell you . . . that he wanted to get rid of his wife?" To this question he replied, "He said, 'I wish to God I was rid of her'; he didn't say he was going to kill her though." The defendant explains this expression, and it is evident Mr. Tyler did not understand the defendant to mean he wished she were dead so that he might be "rid of her". Upon the contrary this statement reasonably means the defendant was annoyed by his association with her, and would like to secure a separation to relieve him from his financial troubles and frequent quarrels. No other effort was made to prove he proposed to kill her.

Only one other circumstance which was offered in the nature of impeachment is worthy of comment. In response to a question propounded to Mrs. Look as to who were present when Pearl Harshaw told her about throwing the knife at the defendant, the witness replied that the story was told in the presence of her husband and George Main, Jr. When the boy was called by the prosecution in rebuttal, he merely said he did not remember the occurrence.

In a careful reading of the entire record we are impressed with the conviction that a very strong case of self-defense was established. There is no conflict regarding the essential circumstances surrounding the homicide. Every important fact indicates that the defendant acted in self-defense. There is no substantial evidence to the contrary. Circumstances which are vital in the establishment of justifiable self-defense on the part of the defendant were satis-

factorily corroborated. There was no effort to prove the defendant ever inflicted or threatened the deceased or any other person with physical violence. There is no evidence that he ever struck her or that he was the aggressor in this affair. His general reputation as a peaceful and law-abiding citizen was not successfully challenged. We are unable to perceive how the jury could have found him guilty. There is no substantial evidence to support that verdict.

An appellate court is authorized to modify a judgment which is rendered in a criminal case, and may direct the trial court to sentence a defendant for a lesser offense contained within the crime for which he was convicted, provided the evidence adequately supports the lesser offense. (Sec. 1260, Pen. Code; *People* v. *Kelley,* 208 Cal. 387 [281 Pac. 609]; *People* v. *McIntyre,* 213 Cal. 50 [1 Pac. (2d) 443].) There is no evidence in the present case warranting this court in finding the defendant guilty of manslaughter. The undisputed evidence of the defendant and George Main, Jr., is either manufactured, and false, which is inconceivable, or he is innocent of the crime. We are convinced of his innocence.

The appellant challenges an instruction as erroneous which was given to the jury regarding the weight, sufficiency and manner of considering the evidence. This instruction informs the jury they are the sole judges of the weight and sufficiency of the evidence and of the credibility of witnesses. After charging them that they are not to be governed by passion, prejudice or sympathy, the following language is employed: "The importance of your duties requires that you consider the right of the people of the state of California to have the laws properly executed, and that it is with you, citizens selected from the county, that finally rests the duty of determining the guilt or innocence of those accused of crime, and unless you do your duty, laws may as well be stricken from the statute books."

The jury was elsewhere fully and fairly instructed regarding the law of the case. This challenged instruction also contains a clear and impartial statement of general principles of law respecting the weight, sufficiency and manner of considering the evidence, in view of which it is quite

likely the jury was not misled by the warning language above quoted. (*People* v. *Stevens*, 78 Cal. App. 395, 409 [248 Pac. 696].) However, that language does unduly emphasize the enforcement of the law as the only proper fulfillment of the duty of a jury, with the final warning that "unless you do your duty, laws may as well be stricken from the statute books". This language is misleading. It is in the nature of a warning. It may be misconstrued by jurors. In the interest of clarity and justice, it should be omitted.

In the case of *People* v. *Travers*, 88 Cal. 233 [26 Pac. 88, 90], an instruction containing a similar warning to the jury was criticised as erroneous, and a judgment convicting the defendant of murder was reversed. That instruction contained the following language: "The guilt or innocence of this defendant must be determined from the evidence admitted in the case, and not from sympathy or prejudice. If all criminals must go free because there is a possibility of jurors making mistakes, society might as well disband." The court said that this language was objectionable "on account of its apparent hostility to the defendant".

■ The verdict which determines the sanity of the defendant is adequately supported by the evidence. There is some conflict regarding this issue, but the evidence in support of his sanity is very satisfactory. The court appointed two expert alienists, pursuant to section 1027 of the Penal Code, one of whom was a member of the medical staff of the Napa state hospital. After a thorough investigation of the family history, physical and mental condition, traits of character, habits and conduct of the defendant, including the facts involved in the alleged crime of murder with which he was charged, both medical experts testified positively that he was sane. The burden is upon one who pleads insanity as a defense to an alleged crime to prove it by a preponderance of evidence. (8 Cal. Jur. 368, sec. 403.) This burden was not sustained by the defendant in the present case. The verdict determining that he was sane at the time of the homicide is amply supported by the evidence.

The judgment of the defendant's sanity at the time of the homicide is therefore affirmed.

For the reason that the verdict and judgment convicting the defendant of murder of the second degree are not sup-

ported by the evidence, the judgment and the order are reversed.

Pullen, P. J., and Plummer, J., concurred.

A petition for a rehearing of this cause was denied by the District Court of Appeal on December 30, 1932, and an application by respondent to have the cause heard in the Supreme Court, after judgment in the District Court of Appeal, was denied by the Supreme Court on January 12, 1933.