[Crim. No. 4248. In Bank.—October 5, 1939.]

THE PEOPLE, Respondent, v. ROBERT C. PERRY, Appellant.

No appearance for Appellant.

Earl Warren, Attorney-General, R. S. McLaughlin, Deputy Attorney-General, James B. Abbey, District Attorney, H. Pitts Mack, Deputy District Attorney, and Hervey & Holt for Respondent.

THE COURT.—Principally, the facts in this case were supplied from the testimony which was voluntarily given by defendant at a coroner's inquest, and introduced in evidence on the trial of the action. From all the evidence which was adduced therein, it appears that defendant is a fairly well-educated man of 70 years of age; that his home is in some remote spot in Alaska, from which, ordinarily, mail may not be received in this state at times more often than once during a period of one year; that, at the place of his residence in Alaska, defendant is possessed of some financial means and has a family consisting of five children, besides some grandchildren and great-grandchildren; and that following the death of the mother of his children which occurred some years ago, defendant married a woman much younger than himself, who, soon after her marriage to defendant, deserted him and took with her approximately the sum of $27,000 in cash, which, at the instance of the said wife, had been deposited in their joint bank account. Trailing her to impose revenge, "according to the law of the North", defendant went to San Diego, where he found himself without money. Furthermore, a large tumor had developed at one side and the back of his neck, which caused great disfigurement in his personal appearance, and which tumor he was most desirous of having removed by a surgical operation. Because of the long time which ordinarily elapsed between mails from his home, defendant felt that he could not wait until money necessary for his needs could be secured from that source. Hesitating between suicide and robbery as a means of solution of his problems, he finally conceived a plan of robbing a certain bank in the city of San Diego, which employed as its watchman and janitor a young man named Anthony, 29 years of age. Early in the morning of March 16, 1939, defendant saw the janitor sweeping the sidewalk in front of the bank, preparatory, as defendant thought, to the janitor's leaving the premises. Thereupon defendant accosted the janitor and asked him for a ride "down town", which request the latter promised to fulfill. Shortly after the two men had become seated in an automobile which the janitor was driving, defendant exhibited a gun, told the janitor that it was a "hold-up" and demanded that the janitor deliver to him the key to the bank. Having thus secured the said key, defendant asked the janitor whether he would prefer to be "tied up" in the bank, or elsewhere,—to

which query the janitor responded "somewheres else". Thereupon the janitor continued to drive the automobile until it had arrived at a point near one end of a large park, where the automobile was stopped and both men alighted therefrom and went a short distance into the park,—defendant carrying the gun in his right hand. The janitor then suddenly attacked defendant by striking him a blow on his head, which caused defendant to fall to the ground, and the janitor fell on top of him, with the result that defendant pointed his gun into the air and thereupon discharged it. The shot was fatal to the janitor. Defendant left the latter in the park—having concluded, as defendant later testified, that the janitor had fainted from fright, since he, the defendant, had had no thought of committing murder. On his return to the automobile, after leaving the park, defendant found the janitor's wallet lying on the front seat thereof. He then drove to his lodgings, for the purpose, assertedly, of removing some "grass stains" from his clothing. During the time he was at his room, defendant examined the wallet, which contained a few dollars in currency. He testified, however, that he did not disturb the contents of the wallet, but that he placed it in his dresser and left it there. He then drove the automobile to the bank where the janitor had worked and opened the front door thereof with the key which had been obtained by defendant in the "hold-up". Since valuables in possession of the bank were locked in its vault, defendant decided to wait inside the bank until it should be regularly opened by some of its employees. Some time later, the manager and a teller of the bank arrived thereat for that purpose. The double entrance doors were unlocked by them and, in accordance with their custom, while the manager remained at the front door, the teller proceeded to make a tour of the banking rooms to see that everything was in order. In the course of his inspection, the teller suddenly encountered defendant, who, with gun in hand, ordered the teller to call the manager "inside". The teller obeyed the command, but, from his manner, the manager suspected that the teller was about to be "held up" and, instead of "coming in", he went outside and summoned help, which included the police. Having noticed the action taken by the manager, the teller suggested to defendant that he make his escape while it seemed possible for him to do so. Defendant then discarded a mask which he was wearing and,

after having shut the teller in a washroom, left the premises. However, after a short pursuit by civilians, defendant voluntarily surrendered to the police who had arrived on the scene. At that time he admitted that he was "the man they wanted", handed them his gun and an extra "clip" of cartridges, and said that he could not "bring himself to shoot it out in the bank". The bank key was taken from his person.

Defendant was convicted by a jury of the crime of murder in the first degree. For the reason that the verdict was returned without recommendation that defendant be imprisoned in the state prison for life, it became imperative upon the trial judge to pronounce a judgment by which defendant was sentenced to suffer the penalty of death. Although section 190, Penal Code, does not require a jury to specify the death penalty in its verdict,—where the crime of murder in the first degree is found, and no recommendation is made as to the punishment, the law imposes the death penalty (*People* v. *LaVerne*, 212 Cal. 29 [297 Pac. 561]; *People* v. *Farrington*, 213 Cal. 459 [2 Pac. (2d) 814]; *People* v. *Farolan*, 214 Cal. 396 [5 Pac. (2d) 893]); and if a new trial be not granted, it thereupon becomes the duty of the court to pronounce sentence in accordance therewith. (*People* v. *Superior Court*, 202 Cal. 165 [259 Pac. 943]; *People* v. *Adams*, 199 Cal. 361 [248 Pac. 186]; *People* v. *Bollinger*, 196 Cal. 191 [237 Pac. 25]; *People* v. *Welch*, 49 Cal. 174.)

In part, section 1239 of the Penal Code provides that, " . . . When judgment of death is rendered, upon any plea, an appeal is automatically taken without any action by the defendant or his attorney."

Although on the trial of the action defendant was represented by an attorney, neither that attorney nor any other counsel has appeared in this court on the appeal from the judgment in behalf of defendant,—nor has any brief or argument been presented herein in his behalf. It therefore has devolved upon this court to make an examination of the complete record of the proceedings had in the trial court, to the end that it be ascertained whether defendant was given a fair trial on the charge that was preferred against him. In that connection, it is noted that by an information filed in the clerk's office of the county of San Diego, acting for the superior court of this state therein, it was regularly charged that on or about the 16th day of March, 1939, in said county

of San Diego, defendant "did then and there wilfully, unlawfully and feloniously and of his malice aforethought kill and slay one J. R. Anthony, a human being, then and there being and existing". Neither demurrer nor plea other than "not guilty" and "not guilty by reason of insanity" was interposed by defendant to said information.

In effect, section 189 of the Penal Code includes the provision that a murder which is committed in the perpetration of or attempt to perpetrate robbery is murder of the first degree; and by section 211 of the same code, robbery is defined as " . . . the felonious taking of personal property in the possession of another, from his person or immediate presence, and against his will, accomplished by means of force or fear".

There can be no serious question presented respecting the nature of the crime which was committed by defendant. At the time when he shot the janitor, defendant was engaged in the execution of his plan to commit the crime of robbery. The fact that up to that time he had not entered the bank had no legal effect upon the nature of the offense which he had intended to commit. Each of his several acts, at and after the moment when he asked the janitor for a ride in his automobile, was overt and was done in pursuance of the ultimate object. And although the murder was committed at a place far removed from the bank which defendant had intended to rob, the character of the offense was not affected by that fact. In its legal aspect, it was exactly the same as though the janitor had been "held up" on the sidewalk in front of the bank and then compelled to admit defendant into the bank. Neither does the assumed fact that, in accordance with defendant's testimony, the janitor attacked defendant before the janitor was shot, nor that as a result of such attack defendant's pistol was accidentally discharged, have the effect of relieving defendant from the consequences of his act. (*People* v. *Manriquez*, 188 Cal. 602 [206 Pac. 63, 20 A. L. R. 1441]; *People* v. *Hadley*, 175 Cal. 118 [165 Pac. 442]; *People* v. *Milton*, 145 Cal. 169 [78 Pac. 549]; *People* v. *Witt*, 170 Cal. 104 [148 Pac. 928].)

On the trial of the action, few objections to any part of the proceedings were made by able counsel who represented defendant. One of the objections which was presented related to the introduction of certain exhibits, which were ma-

terial to the prosecution of the action,—particularly of memoranda in writing that appeared on scraps of paper which were found in a bureau drawer of the room which for a short time that preceded the commission of the offense had been occupied by defendant. Whether such memoranda had been made by defendant was not shown, but since defendant had already confessed the commission of the crime, and, on his arraignment for sentence, made the statement that he had written the several memoranda, it is clear that defendant suffered no prejudice on the trial by reason of the fact that objection to the admission in evidence of such exhibits was overruled by the trial court.

Another objection was made to the introduction in evidence of certain testimony which was given by defendant at the coroner's inquest over the body of the man who had been killed. But in view of the fact that, immediately preceding the moment when defendant made such statement, defendant was fully advised by the coroner of his constitutional rights in the premises, and the additional fact that his statement was freely and voluntarily made,—the objection to its admissibility was not well taken.

An additional point made by defendant at the trial arose from the fact that the trial court refused to permit the arresting officer to testify whether at the time of arrest defendant was ''in a sort of daze''. It is apparent that the question called for a conclusion by a non-expert witness, and for that reason properly was objectionable (*Holland* v. *Zollner*, 102 Cal. 633, 637 [36 Pac. 930, 37 Pac. 231].) However, in that connection, it should not be assumed that had a question been asked whether defendant *''appeared* to be in a sort of daze'', it properly would have been subject to a similar ruling. (*Holland* v. *Zollner, supra; People* v. *Arrighini,* 122 Cal. 121 [54 Pac. 591] ; *People* v. *Wong Loung,* 159 Cal. 520 [114 Pac. 829] ; *People* v. *Vaughan,* 131 Cal. App. 265 [21 Pac. (2d) 438] ; 8 Cal. Jur. 152, 153.)

In his argument to the jury the deputy district attorney, who was in charge of the prosecution, made some remarks which on first consideration might seem objectionable. For example, he said: ''We have the defendant hearing all of this evidence; he has been here in court. We have given him his chance to take the stand, if he so desires, and he has not

seen fit to do that. . . . There is not one contradiction in the case, as I see it from the evidence, because there is no denial of anybody. . . . Not only from the evidence, but also from the fact that the defendant did not even see fit in this case to take the stand to make any explanation of any kind to you as to what occurred up there and he did not take the stand; he didn't see fit to take the stand because he didn't want to submit himself to cross-examination, Ladies and Gentlemen, to test out something . . . *I personally myself, don't think there is anything you can do but to bring in a verdict of first degree, without any recommendation whatsoever.* . . . The defendant's Counsel has told you in his argument to you that he has done the best he could. Well, I submit to you that he probably has, but what did he have? He didn't have much to go on and he had this general evidence which pointed irrevocably at the defendant and it will always point at him and you cannot get away from it, no matter how long you think it over, and if you do not find the defendant guilty of first degree murder, Ladies and Gentlemen, with no recommendation, *I will not be pleased,* although Mr. Hache [attorney for defendant] would have you believe that I will be, because I did not get this defendant into this spot. . . . You have got the case already of this man not taking the stand, . . . '' (Emphasis added.)

With reference to the comments made by the deputy district attorney regarding the failure of defendant to take the witness stand in his own behalf or to deny any of the incriminating evidence against him, it may be noted that by constitutional amendment, adopted in 1934, section 13 of article I thereof was amended to read that '' . . . in any criminal case, whether the defendant testifies or not, his failure to explain or to deny by his testimony any evidence or facts in the case against him may be commented upon by the court and by counsel, and may be considered by the court or the jury.'' And the same matter is covered by the provisions of section 1323 of the Penal Code.

██ With respect to the statements which were made by the deputy district attorney concerning his own view of the case, the impropriety thereof is covered by American Bar Association Canon 15 and Boston Bar Association Canon XVI, respectively, as follows: ''It is improper for a lawyer to assert in argument his personal belief in his client's in-

nocence or in the justice of his cause." " 'It is improper for a lawyer to assert in argument his personal belief in his client's innocence, in the truthfulness or untruthfulness of a witness, or in the justice of his client's cause, that belief being neither competent evidence nor fair argument.' " Although the expression by the deputy district attorney of his personal opinion of the effect of the evidence probably was contrary to the strict ethics of the profession and in the particular circumstances constituted mild misconduct on his part, nevertheless, no objection thereto was interposed by counsel who represented defendant on the trial of the action; neither did he make a motion to strike such remarks from the record, nor that the jury be instructed to disregard them. It becomes apparent, therefore, that defendant is in no position to complain of any of such comments.

Another matter of procedure regarding which counsel for defendant complained at a time when the motion for a new trial was presented to the trial court, was based in part upon the defendant's withdrawal of his plea of "not guilty by reason of insanity". It appears that, although on his arraignment for plea defendant had pleaded both "not guilty" and "not guilty by reason of insanity",—after the trial on the issue of "not guilty" had ended, and the trial judge had directed that counsel proceed with the trial of the issue of "not guilty by reason of insanity",—defendant, in person, withdrew his said plea of "not guilty by reason of insanity". That he did so is clearly indicated by the following excerpt from the record of the proceedings had at the time mentioned, to wit:

"Mr. Hache: Well, I don't know—Mr. Perry thinks—I informed Mr. Perry that I am willing to proceed with this insanity plea but Mr. Perry says that he doesn't want any more publicity and does not want anything about his family brought in. He doesn't want his family to know anything about it. He would rather waive any further proceedings, and says he would take it on the chin. The Court: Is that correct, Mr. Perry? Do you at this time withdraw your plea of not guilty by reason of insanity, heretofore entered, and do you at this time consent, and do you now waive and withdraw your plea of not guilty by reason of insanity heretofore entered? Defendant Perry: Yes. The Court: Very well. Mr. Hache: Do you understand that Mr. Perry? Do

you understand what he said? If you didn't, come up here and you can hear a little bit better. The Court: You may read that to the defendant, Mr. Reporter. Thereupon the statement of the Court is read by the Reporter. Defendant Perry: Yes. The Court: You understand that thoroughly, Mr. Perry? Defendant Perry: Yes, it means not to take the stand on the insanity plea, is that it? The Court: It means that you are withdrawing your plea of not guilty by reason of insanity heretofore entered. Defendant Perry: Now if I was to take the stand, I know that my lawyer, the questions that was put to me by him would be all right. The Court: Well, the sole question I am interested in, Mr. Perry, is do you at this time withdraw your plea of not guilty by reason of insanity heretofore entered, and do you at this time withdraw and waive that plea of not guilty by reason of insanity? Defendant Perry: Yes. The Court: Very well. Defendant Perry: I will join my boy that I lost in the World War.''

In that connection, at the time when the motion for new trial was argued defendant's counsel suggested that the actions and conduct of defendant throughout the commission of the crime, and at all times thereafter, were those ''of a man that is not in his right mind''; and that especially was that conclusion deducible from the fact that defendant had precluded himself ''from at least attempting to prove that he is [was] insane''. Defendant's counsel then made the implied motion that ''the question as to the sanity'' of defendant be judicially determined,—which motion was denied by the trial court.

By the terms of section 1367 of the Penal Code it is provided that, ''A person cannot be tried, adjudged to punishment, or punished for a public offense, while he is insane''. And, in substance, section 1368 of the Penal Code provides that, ''If at any time during the pendency of an action and prior to judgment a doubt arises as to the sanity of the defendant, the court must order the question as to his sanity to be determined by a trial by the court without a jury, or with a jury, if a trial by jury is demanded; . . . ''

The principle of law by virtue of which an insane man, even though incontestably guilty of the commission of a criminal offense, may neither be tried, sentenced, nor punished for his dereliction in that regard, is of long standing. In 4 Blackstone Commentaries, 24, it is said: ''Also if a man in his

sound memory commits a capital offense, and before arraign-ment for it, he becomes mad, he ought not to be arraigned for it; because he is not able to plead to it with that advice and caution that he ought. And if, after he has pleaded, the prisoner becomes mad, he shall not be tried: for how can he make his defence? If, after he be tried and found guilty, he loses his senses before judgment, judgment shall not be pronounced; and if, after judgment, he becomes of non-sane memory, execution shall be stayed; for peradventure, says the humanity of the English law, had the prisoner been of sound memory, he might have alleged [25] something in stay of judgment or execution. Indeed, in the bloody reign of Henry the Eighth, a statute was made, which enacted that if a person, being *compos mentis* (of sane mind) should com-mit high treason, and after fall into madness, he might be tried in his absence, and should suffer death, as if he were of perfect memory. But this savage and inhuman law was re-pealed by the statute 1, and 2 P. and M., c. 10. For, as is observed by Sir Edward Coke, 'the execution of an offender is for example *ut poena ad paucos, metus ad omnes perveniat* (that the punishment may reach the few, but the fear of it affect all): but so it is not when a madman is executed; but should be a miserable spectacle, both against law, and of ex-treme inhumanity and cruelty, and can be no example to others.' ''

In the case of *Freeman* v. *People,* 4 Denio (N. Y.), 9, 20 [47 Am. Dec. 216], after having referred to the foregoing common-law rule, it is said that: ''As is said in 4 Harg. State Trials, 205, 'there may be circumstances lying in his private knowledge, which would prove his innocency, of which he can have no advantage, because not known to the persons who shall take upon them his defence.' The most distinguished writers on criminal jurisprudence concur in these humane views, and all agree that no person, in a state of insanity, should ever be put upon his trial for an alleged crime, or be made to suffer the judgment of the law. A madman cannot make a rational defence, and as to punishment, *furiosus solo furore punitur.* (1 Hale, P. C. 34, 35; 4 Bl. Com. 395, 6; 1 Ch. C. L. ed. 1841, p. 761; 1 Russ. on C. ed. 1845, p. 14; Shelf. on Lunacy, 467, 8; Stock. on Non Com. 35, 6.)'' Practi-cally an identical reference to the history of and the reason for the rule may be found in the case entitled *In re Buchanan,*

129 Cal. 330 [61 Pac. 1120, 50 L. R. A. 378]. (See, also, 1 Chitty Crim. Law, 619 [*761].)

It therefore becomes clear that the governing statute, in reality, is but a codification of an already existing common-law rule, which, in effect, is so declared in each of the cases hereinbefore cited. Also, in each of those latter authorities the basis for a correct conclusion respecting the mental condition of the person whose sanity is in question is declared to be that if he is capable of understanding the nature and object of the proceedings against him and can conduct his defense in a rational manner, he should be deemed sane for the purpose of being tried, though on some other subjects his mind may be deranged or unsound. (See, also, *People* v. *Ziegler,* 142 Cal. 337, 340 [75 Pac. 1090]; *People* v. *Kirby,* 15 Cal. App. 264, 268 [114 Pac. 794]; *People* v. *West,* 25 Cal. App. 369, 372 [143 Pac. 793]; *People* v. *Vester,* 135 Cal. App. 223 [26 Pac. (2d) 685].)

■ From a consideration of the language employed in section 1368 of the Penal Code, it becomes obvious that the "doubt" as to the sanity of a defendant is one that must arise in the mind of the trial judge, rather than in the mind of counsel for the defendant or in that of any third person. (*People* v. *Rosner,* 78 Cal. App. 497 [248 Pac. 683]; *People* v. *Lee Fook,* 85 Cal. 300 [24 Pac. 654]; *People* v. *Fountain,* 170 Cal. 460 [150 Pac. 341]; *People* v. *Huntoon,* 41 Cal. App. 392 [182 Pac. 776].)

Ordinarily, the question whether a "doubt" has arisen as to the sanity of the defendant is for the determination of the judge of the trial court. (*People* v. *Keyes,* 178 Cal. 794, 802 [175 Pac. 6]; *People* v. *Hettick,* 126 Cal. 425, 428 [58 Pac. 918]; *People* v. *Fountain,* 170 Cal. 460, 467 [150 Pac. 341]; *People* v. *West,* 25 Cal. App. 369 [143 Pac. 793].) And it is only where, as a matter of law, a "doubt" may be said to appear, or where there has been an abuse of the discretion that is vested in the trial judge, in the determination of the question, that the conclusion of the latter properly may be disturbed on appeal therefrom. (*People* v. *Gilberg,* 197 Cal. 306, 317 [240 Pac. 1000]; *People* v. *Moriarity,* 61 Cal. App. 223 [214 Pac. 485]; *People* v. *Rosner,* 78 Cal. App. 497 [248 Pac. 683]; *People* v. *Kirby,* 15 Cal. App. 264 [114 Pac. 794]; *People* v. *Little,* 68 Cal. App. 674 [230 Pac. 178]; *People* v. *Hettick,* 126 Cal. 425 [58 Pac. 918].)

 Furthermore, on again reverting to the record of the proceedings herein, and particularly to that part thereof which purports to set forth the testimony which was given by defendant at the coroner's inquest, as well as a sworn statement which was made by him immediately after his motion for new trial was denied, it becomes indisputable that defendant thoroughly understood "the nature and object of the proceedings against him", and that he was "capable of conducting his defense in a rational manner". Therefore, it follows that no error was committed by the trial court in its order denying defendant's motion that the question of his sanity should be determined before judgment be pronounced against him.

 The instructions which the trial court gave to the jury included the following language, to wit: "The importance of your duties requires that you consider the right of the People of the State of California to have the laws properly executed and that it is with you, citizens selected from the County, that finally rests the duty of determining the guilt or innocence of those accused of crime and unless you do your duty, laws may as well be stricken from the statute books. You should also ever keep in mind the importance to the accused of the result of your deliberations and be just to him, as well as to the People of the State of California."

Considered in the abstract, and consequently dissociated from the facts and pertinent law of the case, such language may not appear to be objectionable. But, on reflection, it is evident that this was not the ordinary criminal case. A murder trial was in progress. All the sordid facts, as placed in evidence, were fresh in the minds of the respective jurors and probably were indelibly impressed thereon. The law, in minute detail, was solemnly declared by the judge; and he then added the admonishing words that unless the jurors performed their sworn duty with reference thereto, such laws might "as well be stricken from the statute books". It is obvious that such a declaration does not constitute the law, nor any part of it. It amounts to a statement of the personal opinion only of the judge with reference to asserted facts or an assumed civic consequence or condition. He clearly overstepped his prerogative as an official exponent of the law. In effect, such language was in the nature of a lecture on economics. Although no law was erroneously stated, the jury

may not have understood the full import of his words, nor may it have been influenced thereby. However, in a "close" case, such a statement might become a potent factor in the process of reaching a verdict of "guilty". But ordinarily, however "dangerous" in fact such an instruction might be to the rights of a defendant in a criminal case, it appears that in each of several adjudicated cases in this state, a similar instruction has been held not to have been prejudicial. In the case of *People* v. *Stevens,* 78 Cal. App. 395, 409 [248 Pac. 696], wherein the question was first presented, it was said: "It is claimed that the trial court erred in giving the following instruction: 'The importance of your duties requires that you consider the rights of the people of the State of California to have the laws properly executed, and that it is with you, citizens selected from the county, that finally rests the duty of determining the guilt or innocence of those accused of crime, and unless you do your duty, laws may as well be stricken from the statute books.' It is said that by this instruction the jury was told that 'laws should be stricken from the statute books if they do not convict' and that it was the duty of the jury to convict. This part of the instruction was not as carefully drawn as it might have been, but we think it contains language that saves it from the condemnation which is now sought to be placed upon it. The jury was told that the duty of its members was to see that the laws were properly executed. This language informed the jury, in effect, that it was to discharge its duties under the law as given in the entire instructions of the Court. The jury was also told that it was its duty to determine the guilt or innocence of the defendants, and that, in effect, unless this duty was performed, laws might as well be stricken from the books. As thus viewed we think the instruction was proper. It was not greatly different in legal effect from some parts of the instruction approved by us in *People* v. *Selby,* 76 Cal. App. 715 [245 Pac. 792]. It must be observed that the court gave to the jury, in connection with and following the language upon which appellants base their claim of error, this further statement: 'You should also ever keep in mind the importance to the accused of the result of your deliberations and be just to him, as well as to the People of the State of California. Both the public and the defendant have a right to demand, and they do so demand and expect, that you will carefully

and dispassionately weigh and consider the evidence and the law of the case and give to each your conscientious judgment; and that you will reach a verdict that will be just to both sides, regardless of what the consequences may be.' This language, taken together with that to which appellants take exception, made the instruction eminently fair.''

The question was again before the court in the case of *People* v. *Harshaw,* 128 Cal. App. 212, 219 [16 Pac. (2d) 1025]. In that case the court declared that: ''The appellant challenges an instruction as erroneous which was given to the jury regarding the weight, sufficiency and manner of considering the evidence. This instruction informs the jury they are the sole judges of the weight and sufficiency of the evidence and of the credibility of witnesses. After charging them that they are not to be governed by passion, prejudice or sympathy, the following language is employed: 'The importance of your duties requires that you consider the right of the people of the state of California to have the laws properly executed, and that it is with you, citizens selected from the county, that finally rests the duty of determining the guilt or innocence of those accused of crime, and unless you do your duty, laws may as well be stricken from the statute books.' The jury was elsewhere fully and fairly instructed regarding the law of the case. This challenged instruction also contains a clear and impartial statement of general principles of law respecting the weight, sufficiency and manner of considering the evidence, in view of which it is quite likely the jury was not misled by the warning language above quoted. (*People* v. *Stevens,* 78 Cal. App. 395, 409 [248 Pac. 696].) However, that language does unduly emphasize the enforcement of the law as the only proper fulfillment of the duty of a jury, with the final warning that 'unless you do your duty, laws may as well be stricken from the statute books'. This language is misleading. It is in the nature of a warning. *It may be misconstrued by jurors. In the interest of clarity and justice, it should be omitted.''* (Emphasis added.)

In the case of *People* v. *Navarro,* 135 Cal. App. 535 [27 Pac. (2d) 652], a similar conclusion was reached. It was there said: ''We have read the entire charge and are unable to say any of the instructions are open to serious criticism. One paragraph taken from a lengthy statement of general principles which were announced as rules to govern the jury's

consideration of evidence is challenged. It includes the objectionable statement that with the jury 'finally rests the duty of determining the guilt or innocence of those accused of crime, and unless you do your duty laws may as well be stricken from the statute books.' This language has been criticised by the appellate courts as misleading, objectionable and in the nature of a warning to the jury. (*People* v. *Harshaw,* 128 Cal. App. 212 [16 Pac. (2d) 1025]; *People* v. *Stevens,* 78 Cal. App. 395, 409 [248 Pac. 696].) In the present case, however, we think the objectionable language was harmless since it was immediately followed by the statement that 'You should also keep in mind the importance to the accused of the result of your deliberations, and be just to him as well as to the People of the State of California'. While the foregoing challenged language *should have been omitted from the instruction,* we are of the opinion it does not constitute reversible error." (Emphasis added.)

No prejudicial error appearing in the record herein, it is ordered that the judgment, and the order by which defendant's motion for a new trial was denied, be, and they are, affirmed.

Rehearing denied.